# Exhibit A

No. 25-_____

In the
# Supreme Court of the United States

_____

MARK S. SCOTT,

*Petitioner*,

v.

UNITED STATES OF AMERICA AND
KARL SEBASTIAN GREENWOOD,

*Respondents*.

_____

**On Petition for Writ of Certiorari to the
United States Court of Appeals
for the Second Circuit**

_____

**PETITION FOR WRIT OF CERTIORARI**

_____

ROGER LEE STAVIS
 *Counsel of Record*
KEVIN M. BROWN
MINTZ & GOLD LLP
600 Third Avenue, 25th Floor
New York, NY  10016
(212) 696-4848
stavis@mintzandgold.com

*Counsel for Petitioners*

July 21, 2025

i

## QUESTION PRESENTED

Whether the United States Court of Appeals for the Second Circuit applied the wrong standard to the admission of perjured testimony that the government knew to be perjured, when it applied a "reasonable likelihood" standard instead of the "beyond a reasonable doubt" standard required by this Court in *Glossip v. Oklahoma*, 145 S. Ct. 612 (2025).

ii

## PARTIES TO THE PROCEEDING

Petitioner is Mark S. Scott. Mr. Scott was the Defendant in the United States District Court Southern District of New York and the Appellant in the United States Court of Appeals for the Second Circuit. Before the district court, Mr. Scott had the following co-defendants: Ruja Ignatova, Konstantin Ignatov, David R. Pike, Karl Sebastian Greenwood, Frank Schneider, and Irina Dilkinska. Like Mr. Scott, Mr. Greenwood appealed his conviction. The court of appeals consolidated Mr. Scott's appeal with Mr. Greenwood's.

Respondents are the United States of America, the appellee before the United States Court of Appeals for the Second Circuit, and Karl Sebastian Greenwood, the appellant in the related Second Circuit appeal.

iii

## STATEMENT OF RELATED PROCEEDINGS

*United States v. Greenwood et al.*, No. 24-368, U.S. Court of Appeals for the Second Circuit. Order denying rehearing entered April 21, 2025. Judgment entered May 14, 2025.

*United States v. Greenwood et al.*, No. 23-7199, U.S. Court of Appeals for the Second Circuit. Order denying rehearing entered April 21, 2025. Judgment entered May 14, 2025.

*United States v. Scott et al.,* No. 1:17-cr-00630-ER-1, U.S. District Court for the Southern District of New York. Judgment entered February 2, 2024. Amended Judgment entered February 13, 2024.

*United States v. Scott et al.,* No. 1:17-cr-00630-ER-2, U.S. District Court for the Southern District of New York. Judgment has not been entered.

*United States v. Scott et al.,* No. 1:17-cr-00630-ER-3, U.S. District Court for the Southern District of New York. Judgment entered March 7, 2024.

*United States v. Scott et al.,* No. 1:17-cr-00630-ER-4, U.S. District Court for the Southern District of New York. Judgment entered March 10, 2022.

*United States v. Scott et al.,* No. 1:17-cr-00630-ER-5, U.S. District Court for the Southern District of New York. Judgment entered September 25, 2023. Amended Judgment entered January 19, 2024.

*United States v. Scott et al.,* No. 1:17-cr-00630-ER-6, U.S. District Court for the Southern District of New York. Judgment has not been entered.

iv

*United States v. Scott et al.,* No. 1:17-cr-00630-ER-7, U.S. District Court for the Southern District of New York. Judgment entered May 2, 2024.

*United States v. Scott et al.,* No. 1:17-cr-00630-ER-8, U.S. District Court for the Southern District of New York. Judgment entered October 18, 2024.

v

# TABLE OF CONTENTS

QUESTION PRESENTED...........................................i

PARTIES TO THE PROCEEDING ...........................ii

STATEMENT OF RELATED PROCEEDINGS.........iii

TABLE OF CONTENTS .............................................v

TABLE OF AUTHORITIES......................................vii

OPINIONS BELOW ..................................................1

JURISDICTION ........................................................2

STATUTORY PROVISIONS INVOLVED..................2

STATEMENT OF THE CASE ...................................2

A.    OneCoin ..........................................................2

B.    Proceedings Before the District Court .............5

C.    Proceedings Before the United States Court
of Appeals for the Second Circuit ......................9

SUMMARY OF THE ARGUMENT ...........................11

REASONS FOR GRANTING THE WRIT..................12

CONCLUSION .........................................................20

APPENDIX

Appendix A

    Summary Order of the United States Court
    of Appeals for the Second Circuit, filed
    January 31, 2025................................................1a

Appendix B

    Opinion and Order of the United States
    District Court for the Southern District of
    New York, filed September 14, 2023.................16a

vi

Appendix C

    Denial of Rehearing of the United States
    Court of Appeals for the Second Circuit,
    filed April 21, 2025............................................ 70a

Appendix D

    Denial of Rehearing of the United States
    Court of Appeals for the Second Circuit,
    filed April 21, 2025............................................ 72a

Appendix E

    Relevant Statutory Provisions .......................... 74a

vii

## TABLE OF AUTHORITIES

**Cases**

*Barnes v. United States,*
   412 U.S. 837 (1973)..............................................13, 14

*Glossip v. Oklahoma,*
   145 S. Ct. 612 (2025)........................................... 11-19

*Napue v. Illinois,*
   360 U.S. 264 (1959)............................................14, 15

*United States v. Bagley,*
   473 U.S. 667 (1985)............................................13, 14

*United States v. Stewart,*
   433 F.3d 273 (2d Cir. 2006) ..................................... 13

*United States v. White,*
   972 F.2d 16 (2d Cir. 1992) ...................................... 14

**Statutes**

18 U.S.C. § 1956 ..........................................................6

28 U.S.C. §1254 ..........................................................2

1

## PETITION FOR WRIT OF CERTIORARI

Petitioner Mark S. Scott respectfully petitions for a writ of certiorari to review the judgment of the United States Court of Appeals for the Second Circuit in this case, vacate that decision, and remand.

## OPINIONS BELOW

The decision of the United States Court of Appeals for the Second Circuit is an unpublished summary order, issued on January 31, 2025, and is available at: *United States v. Greenwood*, No. 23-7199, 2025 WL 354692 (2d Cir. Jan. 31, 2025), at *United States v. Greenwood*, No. 23-7199 (2d Cir.) (ECF No. 85), and App. 1a–15a.

The order of the United States Court of Appeals for the Second Circuit denying rehearing en banc in Mr. Scott's appeal is an unpublished order, issued April 21, 2025, and is available at *United States v. Scott,* No. 24-368 (2d Cir.) (ECF No. 64) and App. 70a-71a.

The order of the United States Court of Appeals for the Second Circuit denying rehearing en banc in Mr. Greenwood's appeal is an unpublished order, issued April 21, 2025 and is available at *United States v. Scott,* No. 23-7199 (2d Cir.) (ECF No. 92), and App. 72a-73a.

The decision of the United States District Court for the Southern District of New York is an unpublished decision, issued on September 14, 2023, and is available at *United States v. Scott*, No. 17-cr-630 (ER), 2023 WL 6064329 (S.D.N.Y. Sep. 14, 2023), at *United States v. Scott,* No. 17-cr-630-ER (ECF No. 577) and App. 16a-69a.

2

## JURISDICTION

The United States Court of Appeals for the Second Circuit issued its opinion on January 31, 2025, and denied rehearing en banc on April 21, 2025 App. 1a-15a, 70a–71a. This Court has jurisdiction under 28 U.S.C. §1254(1).

## STATUTORY PROVISIONS INVOLVED

The relevant statutory provisions are reproduced at App. 74a–76a.

## STATEMENT OF THE CASE

### A.   OneCoin

1. The United States prosecuted Mark S. Scott because of Mr. Scott's involvement with Ruja Ignatova and the cryptocurrency she claimed to have created: "OneCoin."[1]

Mr. Scott met Ruja in 2015, when Mr. Scott was a partner in the Florida offices of the law firm Locke Lord LLP, representing primarily private-equity clients in corporate transactions. (App. 18a-19a; C.A. App. 740.) A longtime client of Mr. Scott's, Gilbert Armenta, introduced Mr. Scott to Ruja. (C.A. App. 672.) Ruja claimed she created OneCoin as a new cryptocurrency, and that she had started a related business, based in Sofia, Bulgaria, selling "trading packages" that combined educational material with "tokens" convertible into OneCoin, which she dubbed "the Bitcoin killer." (C.A. App. 86-87.)

---

[1]    To avoid confusion, we refer to Ruja Ignatova and her brother Konstantin Ignatov by their first names.

3

Ruja told Mr. Scott that her OneCoin ventures were profitable, and she asked Mr. Scott for legal advice about protecting her assets against various risks. (C.A. App. 494-95, 673.) She also requested advice because, in her view, OneCoin stood at the junction of cryptocurrency and "network marketing" (also known as multilevel marketing), the sales technique OneCoin used to sell "trading packages," which technique was often "confuse[d] with Ponzi [schemes] and other illegal ways of doing business." (C.A. App. 673.) Ruja requested help "operat[ing] [her] business as much as possible within legal frameworks," noting that she would "take extremely serious[ly]" the "risk [of] not being 'legal' in [the] USA." *Id.* Ruja also explained that she had "several other businesses," i.e., "[s]ome private equity like investments" that she "treat[ed] differently as personal assets." *Id.* For these assets, she "look[ed] for anonymity and asset protection." *Id.*

While Mr. Scott's colleagues from Locke Lord's London office advised Ruja on the regulation of cryptocurrency and marketing,[2] Mr. Scott sought to provide Ruja with the "complete privacy" she sought for her assets. (C.A. App. 574-75, 580-629 675.) To do so, Mr. Scott created the Fenero Funds ("Funds"), a series of British Virgin Islands ("BVI") investment

---

[2]    Locke Lord LLP, as part of its new client engagement, first in late 2015, and again in early 2016, conducted its own due diligence on Ruja and OneCoin. The firm found nothing that barred it from accepting an engagement by Ruja and OneCoin. The government dismissed this established fact, claiming "the idea that Mr. Scott . . . can rely on [Locke Lord]'s diligence, you should throw that in the trash. It's a total distraction." (C.A. App. 545).

4

funds that Mr. Scott registered with authorities there, engaging the London office of Apex Group, a nonbank fund administration company, as the Funds' administrator. (App. 20a; C.A. App. 178-79, 675-89.) Starting in August 2016, Ruja invested approximately €354 million in the Fenero Funds through non-U.S. companies that she controlled but which third parties, like OneCoin lawyer Irina Dilkinska, nominally owned. (C.A. App. 718, 768.) Most of these foreign companies made their investments in the Funds from large and reputable European and Asian banks in Euro denomination. (C.A. App. 231, 768.) None of these companies used U.S. banks. Mr. Scott agreed to manage the Funds, in no way disguising his involvement: naming their management company after himself and regularly reporting his and the Funds' foreign bank accounts and his Funds-related income to U.S. authorities. (C.A. App. 178, 382.)

The Funds arrangement was short lived. The Funds invested €7.3 million in a European credit-card-related business. (C.A. App. 195.) The Funds also agreed to loan $60 million to CryptoReal Investment Trusts, a Ruja-affiliated company, to help finance the acquisition of an oil field in Madagascar from Barta Holdings, an entity affiliated with a Hong Kong energy magnate. (C.A. App. 741-46.) After wiring half that amount to a Hong Kong bank account relating to the oil field transaction, (C.A. App 420), Apex began demanding that Mr. Scott provide more information about the Funds' investors, and he further disclosed to Apex the connection of some of the funds he managed with OneCoin. (C.A. App. 202, 208.) Mr. Scott took no steps to hide the Funds' connection to Ruja and to OneCoin. Scott provided additional documentation,

5

including letters of comfort that he drafted for foreign lawyers to sign and a contract showing that one of his investors provided marketing services for OneCoin. (App. 19a-21a.) After Apex continued to delay, Scott terminated Apex as the Funds' administrator. (C.A. App. 747-67.)

Mr. Scott then began requesting additional "know your customer" information from Ruja. (C.A. App. 781-82.) Ruja failed to respond to these requests and complained that Scott was moving too slowly. (C.A. App. 780-81.) By October 2016, Scott arranged with Ruja and her London-based family office to turn the Funds over to a trust and end his own involvement. (C.A. App. 780-84.) By the following summer, the Funds had returned practically all their money, and Scott's brief involvement with Ruja ended. (C.A. App. 388-89.)

2. Subsequent events made clear that OneCoin was not a "Bitcoin killer," as its multi-level marketing promoters had claimed, (C.A. App. 86), but a fraud. The purported blockchain did not exist, a fact known only to Ruja, her co-founder Sebastian Greenwood, and certain OneCoin information technology personnel. (C.A. App. 134-36, *see also* C.A. App. 97.] OneCoins could not be traded on an internal exchange, and their price was not determined by computational or market forces. (App. 17a-18a.) Ruja disappeared in October 2017, (C.A. App. 98); she remains a fugitive today.

**B.  Proceedings Before the District Court**

1. Scott was arrested in September 2018 and charged with one count of money-laundering conspiracy. (C.A. App. 45.) Less than a month before

6

trial, the government filed a superseding indictment also charging Scott with bank-fraud conspiracy. (C.A. App. 50-52.)

To convict Scott of money-laundering conspiracy, the government needed to prove that Mr. Scott knew the funds at issue were proceeds of a crime—i.e., that he knew OneCoin was a fraud. 18 U.S.C. § 1956(a)(1)(B)(i), (a)(2)(B)(i), (c)(1). The defense was that he did not.

2. The government offered only negligible and circumstantial documentary evidence that Scott knew OneCoin was a fraud, consisting most prominently of two emails Scott received in which third parties suggested that OneCoin could be a fraud or was under investigation. (*See* C.A. App. 775, 789, 792.)[3]

Trying to establish Mr. Scott's knowledge of OneCoin's fraudulent nature, the government called Ruja's brother, Konstantin Ignatov, to testify. Konstantin ran the OneCoin scheme following Ruja's October 2017 disappearance. In its opening the government promised the jury that a highly positioned OneCoin insider would prove Mr. Scott's culpability.

---

[3]    The government also presented evidence that Apex Group—the Funds' nonbank administrator—believed that it was deceived by Scott's lack of transparency about the ultimate sources of the Funds' capital. (C.A. App. 178-79.) But the defense argued that any perceived lack of transparency was consistent with Scott seeking to help a wealthy person mask her ties to funds that she had *lawfully* obtained through OneCoin or otherwise. The latter is not money laundering under § 1956. And in any event, Paul Spendiff, a managing director at Apex, acknowledged that Scott had in fact disclosed, in account-opening information, that Ruja was involved in the Funds' creation. [A-172, 209-11.]

7

Konstantin, testifying under a cooperation agreement, was the only government witness (other than the arresting FBI agent and an employee of Apex Group, the Funds' administrator) who had met Scott. As such, Konstantin's testimony was central to the government's case.[4] Konstantin identified Scott as "one of the main money launderers for OneCoin." (C.A. App 80.) He further testified that Scott traveled to Sofia, Bulgaria on July 20, 2016, to meet at length with Ruja and Irina Dilkinska—whom Konstantin described as OneCoin's head money launderer, (C.A. App. 81)—who allegedly told Konstantin "she had to stay a long time" until "Mark Scott understood everything that has to be done[.]" (C.A. App. 109-10.) But Dilkinska could not have attended that meeting because documentary evidence shows she was in India at the time. (C.A. App. 821.) And when Mr. Scott questioned Konstantin on cross-examination about Dilkinska's presence at the meeting, Konstantin doubled down, asserting that he was "confident" and agreeing that he was "a hundred percent sure" Dilkinska was there. (C.A. App. 147-48.)

3.  The jury convicted Scott. (C.A. App. 567.)

4.  The trial court denied Scott's motions for a judgment of acquittal and a new trial premised on, *inter alia*, Konstantin's perjury and the almost

---

[4]    The Government itself argued to the trial court that Konstantin would "help the jury view the evidence with some context surrounding it, so it's not just at some portion of the trial in an endless stream of documents with no testimony surrounding them." (Tr. at 189-90). In other words, without Konstantin, the government's documentary evidence against Mr. Scott as to knowledge would have been little more than an "endless stream of documents" entirely devoid of any "context."

8

entirely foreign nature of the OneCoin fraud. (App. 68a.) The district court resolved the perjury issue against Scott without conducting an evidentiary hearing (which Scott repeatedly requested) to determine whether Konstantin's testimony about the meeting was false, whether he intentionally testified falsely, or what the government knew about the perjury.

5. Konstantin's trial testimony was false in multiple respects.

*First*, as the government conceded, Konstantin lied about his destruction of a OneCoin laptop. Konstantin testified that, in February 2019, he "threw [his laptop] away" in "a trash bin" on "the Las Vegas strip." (C.A. App. 99.) The government concedes, this testimony was perjury. In fact, Konstantin sent the laptop back to Europe, where his girlfriend destroyed it. (C.A. App. 812.)

*Second*, Konstantin repeatedly gave false testimony about the July 20, 2016 meeting between Mr. Scott, Ruja, and Irina Dilkinska in Bulgaria. Konstantin testified in detail that Ruja instructed him to call Dilkinska into the meeting with Scott and then to "make sure that everybody on [the] floor leaves and goes home," (C.A. App. 109), and that Dilkinska said "she had to stay [at the meeting] a long time" until Scott "understood everything . . . he ha[d] to do[.]" (C.A. App. A-109-10.) As noted, Dilkinska could not have attended this meeting because she was indisputably traveling in India from July 19–22. (C.A. App. 821.)

9

## C. Proceedings Before the United States Court of Appeals for the Second Circuit

The court of appeals affirmed Mr. Scott's conviction and sentence by summary order on January 31, 2025.

Regarding Mr. Scott's motion for a new trial based on Konstantin's perjured testimony, the court of appeals held that "the district court did not abuse its discretion" in denying Mr. Scott's motion. Mr. Scott premised his motion on perjured testimony regarding two topics: Konstantin's 2019 disposal of a laptop and Dilkinska's presence at the July 2016 Bulgaria meeting. The court found "no 'reasonable likelihood' that" Konstantin's two instances of perjured testimony "affected the judgment of the jury." Regarding Konstantin's perjurious testimony that in 2019 he threw his laptop into the garbage, the court held that the testimony concerned "a collateral matter" and did not implicate the merits of the government's case against Mr. Scott regarding his alleged participation in bank fraud and money laundering conspiracies. As for Konstantin's testimony regarding Dilkinska's presence at the 2016 Bulgaria meeting, the court of appeals held that Scott had not shown that testimony to be perjurious. The court also noted that, even if Konstantin's testimony regarding the 2016 meeting constituted perjury, that perjury would have only provided Mr. Scott with other means to impeach Konstantin. Because Mr. Scott had an opportunity to impeach Konstantin—a witness whose credibility Mr. Scott had "shown to be questionable"—on several significant topics, the court found the additional impeachment would have been cumulative.[5]

---

[5]    The court of appeals also held that the district court did not abuse its discretion when it excluded certain emails and

10

Mr. Scott also challenged the sufficiency of the evidence against him on the claims for conspiracy to commit money laundering and for conspiracy to commit bank fraud. As to the money laundering claim that rested merely on approximately $50,000 passing through the U.S. wire system, Mr. Scott argued that "(1) the losses suffered by American victims were too trivial compared to the overall losses to establish a domestic nexus, and (2) the government did not offer proof that the money from American victims" ever passed into the Funds.  On the first challenge, the court of appeals held that the money laundering statute does not require that a certain percentage of the proceeds originate in the United States, and thus the fact "that only a portion of the overall losses were suffered by American victims does not render the scheme extraterritorial." On the second challenge to the money laundering claim, the court held that "the government was not required to prove that the specific money obtained from American victims of OneCoin was eventually transferred into" the Funds, but the court held that the government, nevertheless, offered some evidence to that effect.[6] On the bank fraud claim, the court of appeals, again, held that the government offered sufficient evidence to support that claim. The court of appeals held that the government presented evidence of the CryptoReal transaction and evidence in connection with transactions involving Gilbert Armenta.

---

when it quashed a subpoena served by Mr. Scott. The court of appeals likewise rejected Mr. Scott's appeal based on a proposed—and rejected—jury instruction and his venue-based appeal.

[6]    In truth, the government provided no such proof at trial.

11

Mr. Scott then petitioned for rehearing en banc arguing, first, that under the standard for materiality of witness perjury, clarified earlier this year by this Court in an intervening ruling, the court of appeals should grant Mr. Scott a new trial. Second, Mr. Scott argued that the court of appeals needed to clarify the law on the extraterritorial application of the wire fraud statute. Third, Mr. Scott argued that his sentence impermissibly reflected foreign conduct. The United States Court of Appeals for the Second Circuit denied Mr. Scott's petition.

## SUMMARY OF ARGUMENT

Relying on the testimony of the government's lone cooperating witness, Konstantin Ignatov, a jury convicted Mark S. Scott of conspiracy to commit money laundering and for conspiracy to commit bank fraud in a cryptocurrency fraud known as OneCoin. In *Glossip v. Oklahoma*, 145 S. Ct. 612 (2025), this Court clarified that, when the government knew or should have known of a government witness's perjury, a conviction is consistent with due process only if the government proves "beyond a reasonable doubt" that the perjury did not affect the jury's verdict. *Id.* at 627 (quotation omitted). The government—which knew of the perjury—made no such showing here. Nor did the district court analyze Mr. Scott's motion applying that standard to the materiality of Konstantin's perjury. And the court of appeals reviewed the district court's denial of Mr. Scott's motion for a new trial only for abuse of discretion. (App. 8a-10a.) Scott is entitled to a new trial under the correct "beyond a reasonable doubt" standard.

12

This Court rejected the argument—adopted by the court of appeals here—that evidence of a witness's false testimony is immaterial when there was "so much other impeaching evidence" at trial. *Glossip*, 145 S. Ct. at 629. The court of appeal's dismissal of Konstantin's perjury on precisely this basis (namely, that evidence of the perjury would have been immaterial because Konstantin was already "extensive[ly] impeach[ed]" at trial, (App. 9a)), cannot be reconciled with *Glossip*. In assessing the materiality of Konstantin's perjury, the court of appeals also misapprehended the factual record when it found that Konstantin "disclaimed any knowledge of the substance of what was discussed at the meeting" that was a subject of Konstantin's false testimony—testimony the government knew was false. (App. 10a (quotation omitted)). Konstantin did testify to the substance of the disputed meeting. (*See* C.A. App. 109-10.) Unchecked, the court of appeals' *Glossip* missteps will proliferate, creating a risk of prosecutorial misconduct when *Glossip's* dual purpose is to discourage such prosecutorial misconduct and to provide sufficient due process protection to defendants from an unfair conviction based on uncorrected falsities of which the government was aware.

## REASONS FOR GRANTING THE WRIT

This case is appropriate for certiorari. The court of appeals decision is wrong and cannot be squared with this Court's recent clarification of the materiality standard applied to known witness perjury in *Glossip v. Oklahoma*, 145 S. Ct. 612 (2025). The Court should grant the writ, vacate the decision by the court of appeals, and remand.

The court of appeals concluded that there was no "reasonable likelihood" that Konstantin's perjury affected the jury's verdict. (App. 8a-9a (quoting *United States v. Stewart*, 433 F.3d 273, 297 (2d Cir. 2006)).) In finding Konstantin's perjury immaterial, the court of appeals applied a standard and employed a reasoning incompatible with this Court's recent decision in *Glossip v. Oklahoma*, 145 S. Ct. 612 (2025).[7] Accordingly, Mr. Scott unsuccessfully petitioned for rehearing en banc before the court of appeals. The court of appeals' denial of that petition creates a risk that the court of appeals' erroneous reading of *Glossip* could proliferate. Thus, this Court should clarify *Glossip*'s application here and remand for further proceedings.

*First*, the court of appeals misapplied the "any reasonable likelihood" standard. In *Glossip*, this Court clarified that a conviction based on testimony that the government knew to be false cannot stand unless the government can prove "beyond a reasonable doubt" that the error did not contribute to the jury's verdict. 145 S. Ct. at 627 (quoting *United States v. Bagley*, 473 U.S. 667, 680 n.9 (1985) (opinion of Blackmun, J.)). Thus, this Court in *Glossip* applied the "most stringent standard" in American criminal law*, Barnes*

---

[7] In considering Mr. Scott's appeal, the court of appeals failed to address the government's argument that the Constitution allows the government to knowingly rely on false testimony to secure a conviction so long as the government is not aware that the testimony was intended to deceive. But that argument was also foreclosed by *Glossip*. *See* 145 S. Ct. at 627 (due process violated because (A) government witness's testimony was "false," and (B) government "almost certainly had access" to records showing it was false).

14

*v. United States*, 412 U.S. 837, 845-46 (1973). *Glossip* did not apply some less stringent standard. But in Mr. Scott's case, neither the court of appeals nor the district court required the government to prove beyond a reasonable doubt that Konstantin's perjury did not affect the verdict against Mr. Scott, as *Glossip* requires.

It is true that two Justices of this Court once anticipated *Glossip's* holding observing, in dicta, that the "any reasonable likelihood" standard "applicable to the knowing use of perjured testimony" from *Napue v. Illinois*, 360 U.S. 264 (1959), actually equates to the "beyond a reasonable doubt" harmless-error standard. *Bagley*, 473 U.S. at 668, 678–80, n.9 (opinion of Blackmun, J.). But, until *Glossip* earlier this year, a majority of this Court had never endorsed the equivalence suggested by Justice Blackmun in witness perjury cases. As a result, prior decisions of the court of appeals have questioned whether there is any "meaningful difference" between *Napue*'s "any reasonable likelihood" standard and a far less stringent standard that asks whether the Court "is left with a firm belief that **but for** the perjured testimony, the defendant would **most likely** not have been convicted." *United States v. White*, 972 F.2d 16, 21 (2d Cir. 1992) (emphasis added) (cleaned up). The "firm belief" standard of decisions like *White*—a standard that likely undergirded the decisions of the court of appeals and district court here—bears no resemblance to the "beyond a reasonable-doubt standard" of *Glossip*. Accordingly, this Court should reverse the court of appeals and remand for further proceedings applying the "beyond a reasonable doubt" standard endorsed by *Glossip*.

15

Applying *Napue* as clarified by *Glossip*, Mr. Scott should have received a new trial. In fact, the government acknowledged to the district court the importance of Konstantin in "testifying and providing relevant context to the OneCoin enterprise." (C.A. App. 95.) Konstantin represented the government's only cooperating OneCoin conspirator to testify against Mr. Scott, and Konstantin was the only government witness (other than the arresting FBI agent and an Apex employee) who testified to having met Mr. Scott. Likewise, Konstantin, alone among the trial witnesses, attempted to explain the OneCoin scheme, the personalities involved with OneCoin, and OneCoin's fraudulent nature. (*See, e.g.*, C.A. App. 81-94, 102-04, 105-09.) Thus, the government relied on Konstantin, and only Konstantin, to link Mr. Scott to the OneCoin fraud. Konstantin testified that Scott was "one of the main money launderers for OneCoin," (C.A. App. 80), and Konstantin testified (falsely) about Mr. Scott's purported lengthy meeting under suspicious circumstances with Ruja and Dilkinska— OneCoin's head money launderer. (C.A. App. 109-10.)

Konstantin's testimony, therefore, constituted the foundation for the key question at trial: whether Mr. Scott knew OneCoin was a fraud. Given the lack of other evidence on this core question, there is at least a reasonable doubt whether, had the jury heard evidence that Konstantin extensively lied on the stand twice, at least one juror would have declined to convict. *See Glossip*, 145 S. Ct. at 628 ("[A] revelation [that the prosecution's witness lied to the jury under oath] would be significant in any case, and was especially so here where [the witness] was already nobody's idea of a strong witness." (quotation

16

omitted)). Because neither the district court nor the court of appeals analyzed Konstantin's testimony under the Glossip standard—and because failure to address the application of that standard could allow the errors here to proliferate across other courts, leading to unmerited convictions and creating an incentive for prosecutorial misconduct—this Court should address the error.

*Second*, in *Glossip* this Court rejected the argument—adopted by the court of appeals here—that evidence of a witness's false testimony is immaterial when the defendant has already questioned the witness's credibility at trial. The court-appointed amicus supporting affirmance in *Glossip* argued that a cooperating witness's perjured testimony "could hardly have" impacted the verdict because the witness had already been substantially impeached at trial. *Glossip*, 145 S. Ct. at 629. But this Court rejected that position as "self-defeating," explaining that if the evidence impeaching the witness's credibility had been so "overwhelming," then "no reasonable jury could have convicted Glossip in the first place, given that the prosecution's case rested centrally on [the witness's] credibility." *Id.* The Court noted that the amicus appeared "to assume the jury would have believed [the witness] no matter what." *Id.* But an assumption like that "has no place in a materiality analysis, which asks what a reasonable decisionmaker would have done with the new evidence." *Id.* Applying the clarified materiality standard, the Court observed that a "midtrial revelation that [the witness] lied on the stand would have significantly undercut" the prosecution's argument that, despite "his prior dishonesty and violence, [the witness] was now telling

17

the truth." *Id.* Because the witness's credibility was a central issue at trial, the Court concluded that his perjury was material and required a new trial. *Id.* at 630.

Here, the court of appeals concluded that, because Mr. Scott extensively impeached Konstantin at trial, evidence revealing that Konstantin's trial testimony was false would have amounted to mere "cumulative impeachment material," and thus would not have affected the verdict. (App. 8a-9a; *see also id.*) (evidence of Konstantin's perjury about the July 2016 meeting "would have merely furnished an additional basis on which to impeach a witness whose credibility had already been shown to be questionable." (cleaned up)).

But this Court rejected substantially similar reasoning in *Glossip*. 145 S. Ct. at 629. If the evidence impeaching Konstantin's credibility was so "overwhelming, then no reasonable jury could have convicted [Scott] in the first place," given the centrality of Konstantin's testimony (and thus his credibility) to the government's case against Scott. *Id.* Konstantin's perjury on the witness stand serves as powerful evidence of dishonesty, fundamentally different from other forms of impeachment. *See id.* at 628 ("That correction would have revealed to the jury not just that [the witness] was untrustworthy . . . , but also that [he] was willing to lie to them under oath."). *Glossip* expressly recognizes the singular power of such evidence in a jury's credibility determination.

The court of appeals also brushed aside Konstantin's perjury regarding the destruction of his laptop in 2019 as concerning "a collateral matter that did not implicate the merits of the case against Scott." (App. 9a (quotations omitted).) But as *Glossip*

18

explained, false testimony about even "wholly irrelevant" topics is highly relevant to a jury's credibility determination; "[a] lie is a lie, no matter what its subject." 145 S. Ct. at 628 (quotation omitted). Had Mr. Scott caught Konstantin in two lies before the jury, perhaps the jury would have discounted his entire testimony. At the least, it cannot be said that a jury confronted with a twice-caught perjurious witness would beyond a reasonable doubt have returned a guilty verdict.

Moreover, as in *Glossip*, Konstantin did not confine his perjury to collateral matters. His testimony "also bore on [Mr. Scott's] guilt in a more direct way." *Id.* Konstantin's perjured testimony regarding the Dilkinska meeting, where Dilkinska— OneCoin's head money launderer—allegedly told Scott "everything . . . he has to do," (C.A. App. 109–10), bore directly on Scott's alleged knowledge that OneCoin was a fraud. Konstantin's perjury, therefore, directly related to a key dispute at trial: Mr. Scott's knowledge.

In concluding otherwise, the court of appeals misapprehended an important factual point when it echoed the district court's statement that "'Konstantin disclaimed any knowledge of the substance' of what was discussed at the meeting." (App. 10a (quoting the district court).) In doing so, the court of appeals ignored the vivid, incriminating details of Konstantin's supposed recollection: that Ruja instructed him to call Dilkinska into the meeting and to clear the floor, (C.A. App. 109); that this was "the only time" such precautions had been taken during Konstantin's time at OneCoin, [*id.*]; and—most importantly—that Dilkinska told Konstantin "she had

19

to stay [at the meeting] a long time" until Scott "understood everything that . . . he has to do[.]" (C.A. App. 109-10.) As Konstantin testified about the "substance" of the July 2016 meeting, the court of appeals' materiality analysis turned on an important factual error about the content of Konstantin's testimony. And, in declining to revisit the issue en banc, the court of appeals created a substantial risk that future courts will similarly misapply *Glossip*, *failing to provide  sufficient due process to defendants.* This Court should reverse and remand.

20

## CONCLUSION

This Court should grant this petition for certiorari, vacate the court of appeals' decision, and remand.

Respectfully submitted,

ROGER LEE STAVIS
  *Counsel of Record*
Kevin M. Brown
MINTZ & GOLD LLP
600 Third Avenue, 25th Floor
New York, New York 10016
(212) 696-4848
stavis@mintzandgold.com

*Counsel for Petitioners*

July 21, 2025

**APPENDIX**

*i*

**TABLE OF APPENDICES**

*Page*

APPENDIX A — SUMMARY ORDER OF THE
   UNITED STATES COURT OF APPEALS
   FOR THE SECOND CIRCUIT, FILED
   JANUARY 31, 2025 . . . . . . . . . . . . . . . . . . . . . . . . . . .1a

APPENDIX B — OPINION AND ORDER OF
   THE UNITED STATES DISTRICT COURT
   FOR THE SOUTHERN DISTRICT OF
   NEW YORK, FILED SEPTEMBER 14, 2023. . . . .16a

APPENDIX C — DENIAL OF REHEARING
   OF THE UNITED STATES COURT OF
   APPEALS FOR THE SECOND CIRCUIT,
   FILED APRIL 21, 2025 . . . . . . . . . . . . . . . . . . . . . .70a

APPENDIX D — DENIAL OF REHEARING
   OF THE UNITED STATES COURT OF
   APPEALS FOR THE SECOND CIRCUIT,
   FILED APRIL 21, 2025 . . . . . . . . . . . . . . . . . . . . . .72a

APPENDIX E — RELEVANT STATUTORY
   PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .74a

1a

## APPENDIX A — SUMMARY ORDER OF THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT, FILED JANUARY 31, 2025

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

No. 23-7199, 24-368

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 31st day of January, two thousand twenty-five.

UNITED STATES OF AMERICA,

*Appellee,*

v.

KARL SEBASTIAN GREENWOOD,
MARK S. SCOTT,

*Defendants-Appellants,*

RUJA IGNATOVA, ALSO KNOWN AS CRYPTOQUEEN, KONSTANTIN IGNATOV, ALSO KNOWN AS SEALED DEFENDANT 1, DAVID R. PIKE, FRANK SCHNEIDER, IRINA DILKINSKA,

*Defendants.*[*]

---

[*] The Clerk of Court is directed to amend the caption as set forth above.

2a

*Appendix A*

PRESENT:  JOSÉ A. CABRANES,
                    RICHARD C. WESLEY,
                    STEVEN J. MENASHI,
                          *Circuit Judges.*

Appeals from judgments of the United States District Court for the Southern District of New York. (Ramos, J.).

**SUMMARY ORDER**

Upon due consideration, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that the judgments of the district court are **AFFIRMED**.

Defendants-Appellants Karl Sebastian Greenwood and Mark Scott appeal from judgments entered by the United States District Court for the Southern District of New York. Greenwood and Scott were convicted for their respective roles in the OneCoin cryptocurrency scheme. Greenwood was convicted of conspiracy to commit wire fraud, wire fraud, and conspiracy to commit money laundering following his guilty plea to those charges. Scott was convicted of conspiracy to commit money laundering and conspiracy to commit bank fraud following a jury trial. The district court sentenced Greenwood to 240 months of imprisonment on each count, to run concurrently, and ordered forfeiture in the amount of $300,000,000. The district court sentenced Scott to 120 months of imprisonment on each count, to run concurrently, followed by three years of supervised release, and ordered forfeiture in the amount of $392,940,000.

3a

On appeal, Greenwood argues that (1) the district court erred by calculating his sentence based on both domestic and foreign losses of the OneCoin scheme, and (2) his sentence was substantively unreasonable. Scott argues that (1) the district court abused its discretion by denying his motion for a new trial based on the perjury of a government witness, (2) the district court abused its discretion by excluding certain evidence, (3) the government failed to produce sufficient evidence to prove the charge of conspiracy to commit bank fraud, and (4) the government failed to produce sufficient evidence to prove the charge of conspiracy to commit money laundering and his sentence impermissibly reflects extraterritorial conduct. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

**I**

"This court reviews the procedural and substantive reasonableness of a sentence under a deferential abuse-of-discretion standard." *United States v. Richardson*, 958 F.3d 151, 153 (2d Cir. 2020) (internal quotation marks and alteration omitted). "When the defendant has preserved a claim that the district court erred in its application of the sentencing guidelines, we review issues of law *de novo*, issues of fact under the clearly erroneous standard, and mixed questions of law and fact either *de novo* or under the clearly erroneous standard depending on whether the question is predominantly legal or factual." *Id.* (internal quotation marks and alterations omitted). "We will vacate a sentence as substantively unreasonable 'only in

4a

## *Appendix A*

exceptional cases where the trial court's decision cannot be located within the range of permissible decisions, that is, when sentences are so shockingly high, shockingly low, or otherwise unsupportable as a matter of law that allowing them to stand would damage the administration of justice.'" *United States v. Ortiz*, 100 F.4th 112, 122 (2d Cir. 2024) (quoting *United States v. Aldeen*, 792 F.3d 247, 255 (2d Cir. 2015)).

## A

Greenwood argues that the district court impermissibly increased his sentencing guidelines range by considering foreign losses in contravention of our decision in *United States v. Azeem*, 946 F.2d 13 (2d Cir. 1991). We disagree.

The sentencing guidelines define "offense" as "the offense of conviction and all relevant conduct under § 1B1.3." U.S.S.G. § 1B1.1 n.1(I). To identify all relevant conduct, the guidelines instruct a court to consider, in the case of "a jointly undertaken criminal activity," "all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity ... that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." *Id.* § 1B1.3(a)(1)(B). For "offenses of a character for which § 3D1.2(d) would require grouping of multiple counts," relevant conduct also includes "all acts and omissions described in subdivisions (1)(A) and (1)(B)" of § 1B1.3(a)

5a

that "were part of the same course of conduct or common scheme or plan as the offense of conviction." *Id.* § 1B1.3(a)(2). The referenced section requires grouping of wire-fraud and money-laundering offenses. *Id.* § 3D1.2(d).

In light of these provisions, there were at least three types of conduct relevant to the calculation of Greenwood's sentence under the guidelines: (1) "the offense of conviction," including all acts and omissions of others that were within the scope of, in furtherance of, and reasonably foreseeable to the conspiracy; (2) acts that were part of the same "common scheme or plan as the offense of conviction"; and (3) acts that were part of the "same course of conduct ... as the offense of conviction."

Even if the foreign aspects of the OneCoin scheme to which Greenwood pleaded guilty did not qualify as the "offense of conviction," those aspects qualified as "relevant conduct."

The offenses of conviction were domestic wire fraud, conspiracy to commit wire fraud, and conspiracy to commit money laundering—for which the specified unlawful activity was the wire fraud scheme. Neither the wire fraud statute nor the conspiracy statute applies extraterritorially. *See Bascuñán v. Elsaca*, 927 F.3d 108, 121 (2d Cir. 2019); *United States v. Hoskins*, 902 F.3d 69, 96 (2d Cir. 2018). For that reason, the "offense[s] of conviction" concern conduct involving American wires, and the losses underlying the offenses of conviction are the losses attributable to the misuse of American wires.

6a

*Appendix A*

The sentencing guidelines, however, direct a district court also to consider "relevant conduct" that is part of the "same course of conduct or common scheme or plan." U.S.S.G. § 1B1.3(a)(2). The OneCoin conduct that occurred over foreign wires was relevant conduct because it was part of the same common scheme or plan as the domestic conduct. "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." U.S.S.G. § 1B1.3, cmt. n.5(B)(i). Greenwood and his co-conspirators engaged in a multi-level marketing scheme to defraud investors worldwide into purchasing a fraudulent cryptocurrency. The losses effectuated over foreign wires resulted from the same "common scheme or plan" as the losses effectuated over American wires.

Our decision in *Azeem* does not categorically exclude foreign conduct from the "relevant conduct" to be considered under the guidelines. In *Azeem*, we decided not to include foreign activity in the defendant's base offense level because—even though the activity involved the same actors and occurred close in time—the activity occurred entirely abroad and was not a crime against the United States. *See Azeem*, 946 F.2d at 16-17. Azeem was convicted for conspiring to import heroin from Pakistan into the United States. The district court enhanced his base offense level due to a separate heroin transaction from Pakistan to Egypt, even though that heroin was not intended for the United States and the only connections between the two separate transactions were that both

7a

involved the same courier and occurred close in time. *Id.* at 15. Including that foreign drug crime in Azeem's base offense level would have required "distinguishing between activities that violate both domestic and foreign law and those which violate only domestic law or only foreign law." *Id.* at 16-17. In this case, by contrast, the conduct involved a unitary scheme that targeted foreign and domestic victims. A separate analysis is not necessary to conclude that the domestic and foreign aspects of the OneCoin scheme were part of a common scheme or plan. Accordingly, we see no procedural error in the decision of the district court to consider losses attributable to both aspects of the scheme.

## B

Greenwood also challenges the substantive reasonableness of his sentence. We conclude that the district court did not abuse its discretion by imposing a sentence of 240 months of imprisonment. The district court considered both the aggravating factors of Greenwood's conduct—the scale of the scheme, its targeting of vulnerable and poor victims, and Greenwood's extensive profit—and the mitigating factors that Greenwood identifies on appeal. The district court accounted for the severe conditions that Greenwood experienced following his arrest in 2018. Under these circumstances, the sentence does not "constitute a 'manifest injustice' or 'shock the conscience'" because it is not "shockingly high, shockingly low, or otherwise unsupportable as a matter of law." *United States v. Rigas*, 583 F.3d 108, 123, 124 (2d Cir. 2009).

8a

*Appendix A*

**II**

Scott offers four arguments on appeal. First, he argues that the district court abused its discretion by denying his motion for a new trial based on the purported perjury of Konstantin Ignatov. Second, he argues that the district court abused its discretion by excluding evidence as hearsay and quashing a subpoena of Neil Bush. Third, he argues that there was insufficient evidence to support his conviction for conspiracy to commit money laundering. Fourth, he argues that there was insufficient evidence to support his conviction for conspiracy to commit bank fraud.

We review Scott's challenge to the district court's denial of his motion for a new trial and to the district court's exclusion of certain evidence for abuse of discretion. *See United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018); *United States v. Gatto*, 986 F.3d 104, 117 (2d Cir. 2021). We review Scott's challenges to the sufficiency of the evidence on the conspiracy to commit bank fraud and conspiracy to commit money laundering charges *de novo. See United States v. Napout*, 963 F.3d 163, 184 (2d Cir. 2020).

**A**

The district court did not abuse its discretion by denying Scott's motion for a new trial based on Konstantin Ignatov's testimony regarding how he disposed of his laptop in 2019 or his testimony regarding Irina Dilkinska's presence at a meeting. There was no "reasonable likelihood" that the testimony affected the judgment of

9a

the jury. *United States v. Stewart*, 433 F.3d 273, 297 (2d Cir. 2006). Konstantin's perjurious testimony that he threw his laptop into a garbage bin in 2019 concerned "a collateral matter" that did not implicate "the merits of the case" against Scott and his alleged participation in bank fraud and money laundering conspiracies between 2015 and 2018. *United States v. White*, 972 F.2d 16, 20, 21 (2d Cir. 1992). Konstantin's testimony that he was "pretty sure" but not "a hundred percent sure" that Dilkinska was present at the meeting with Scott and Ruja Ignatova in July of 2016 was not shown to be perjurious but, even if it had been, that showing would have "merely furnishe[d] an additional basis on which to impeach a witness whose credibility ha[d] already been shown to be questionable.'" *United States v. Jones*, 965 F.3d 149, 164 (2d Cir. 2020) (quoting *United States v. Parkes*, 497 F.3d 220, 233 (2d Cir. 2007)). As the district court observed, Scott's "extensive impeachment" of Konstantin "on much more significant topics more relevant to the jury's determination of Scott's guilt" meant that evidence undermining Konstantin's testimony about the meeting "would, at most, have been cumulative impeachment material." *United States v. Scott*, No. 17-CR-630, 2023 U.S. Dist. LEXIS 166362, 2023 WL 6064329, at *4, *15, *17 (S.D.N.Y. Sept. 14, 2023).

The district court also did not commit a reversible error by excluding the emails regarding Konstantin's perjury or by declining to hold an evidentiary hearing on the perjured testimony. The government acknowledges that the exclusion of Defense Exhibit 550 was erroneous because the email was admissible under Federal Rule of Evidence 803(3) as a statement of intent. *See United States*

10a

*Appendix A*

*v. Persico*, 645 F.3d 85, 100 (2d Cir. 2011). Yet that error was harmless. "Konstantin disclaimed any knowledge of the substance" of what was discussed at the meeting, so the jury could not have relied on his testimony about the meeting in reaching a verdict. *Scott*, 2023 U.S. Dist. LEXIS 166362, 2023 WL 6064329, at \*17. The district court did not abuse its discretion by excluding Defense Exhibit 552 because it was not a statement of future intent and was properly excluded as hearsay. And the district court was not required to conduct a perjury hearing because "the additional evidence of perjury is not sufficiently material to undermine confidence in the verdict," which obviates the "need to probe the extent of the Government's awareness of the perjury." *Stewart*, 433 F.3d at 302.

## B

The district court did not abuse its discretion by excluding certain emails as hearsay or by quashing the subpoena of Neil Bush. "We review a trial court's evidentiary rulings deferentially," *United States v. Quinones*, 511 F.3d 289, 307 (2d Cir. 2007), and we will disturb a district court's ruling only when the error "had a 'substantial and injurious effect or influence' on the jury's verdict," *United States v. Garcia*, 413 F.3d 201, 210 (2d Cir. 2005) (quoting *United States v. Dukagjini*, 326 F.3d 45, 62 (2d Cir. 2003)).

The emails that Scott sought to introduce qualified as hearsay. Scott told the district court that the emails proved that a partner at his law firm advised Ruja

11a

Ignatova without knowing that OneCoin was a fraud. Contrary to Scott's argument, these emails were not evidence of Scott's "then-existing state of mind" under Federal Rule of Evidence 803(3) but of the partner's purported understanding of OneCoin's business practices. To the extent the partner's understanding bore on Scott's state of mind, the proper way to admit such evidence was to call the partner as a witness. Nor did the district court abuse its discretion by quashing the subpoena of Neil Bush. As the district court noted, evidence of Bush's involvement in the CryptoReal transaction was already presented to the jury. Bush's testimony could not have provided any evidence of Scott's understanding of the legitimacy of the CryptoReal transaction because Bush and Scott never met.

## C

Scott contends that the evidence was insufficient to support his conviction for conspiracy to commit money laundering. In reviewing his challenge, "we must sustain the jury's verdict if, crediting every inference that could have been drawn in the government's favor and viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Raniere*, 55 F.4th 354, 364 (2d Cir. 2022) (quoting *United States v. Capers*, 20 F.4th 105, 113 (2d Cir. 2021)); *see also Cavazos v. Smith*, 565 U.S. 1, 2, 132 S. Ct. 2, 181 L. Ed. 2d 311 (2011) ("A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.").

12a

*Appendix A*

The government sufficiently proved the centrality of domestic use of wires to the money-laundering schemes. The jury saw evidence that OneCoin targeted investors in the United States—including emails between Ruja Ignatova and Scott regarding how to structure OneCoin's American business—and heard the testimony of two American victims concerning the wire transfers they made from their American bank accounts, the promoters in the United States who introduced them to OneCoin, and their losses from their investments in OneCoin.

Scott argues that (1) the losses suffered by American victims were too trivial compared to the overall losses to establish a domestic nexus, and (2) the government did not offer proof that the money from American victims "eventually made its way into the Funds." Scott Br. 45. First, that only a portion of the overall losses were suffered by American victims does not render the scheme extraterritorial. As the district court correctly noted, there is no requirement that a court "parse the percentage of fraudulent proceeds obtained in the United States, as compared to abroad." *Scott*, 2023 U.S. Dist. LEXIS 166362, 2023 WL 6064329, at *12. Second, the government was not required to prove that the specific money obtained from American victims was eventually transferred into the funds, *see United States v. Zvi*, 168 F.3d 49, 56 (2d Cir. 1999), but it nevertheless provided such proof. The government's evidence showed that one of the American victims wired money for a OneCoin package from her bank account in New York to a OneCoin depository account based in the United States, which then transferred her money to the Fenero Funds. Such evidence of OneCoin's use of American wires to effect

13a

transactions "in furtherance of" the global scheme was sufficient to establish a domestic violation of the wire fraud statute. *Bascuñán*, 927 F.3d at 122.

The district court did not err by declining to provide the jury with Scott's supplemental instruction. We will not overturn a conviction for refusal to give a requested jury instruction "unless that requested instruction is legally correct, represents a theory of defense with basis in the record that would lead to acquittal, and the theory is not effectively presented elsewhere in the charge." *United States v. Holland*, 381 F.3d 80, 84 (2d Cir. 2004) (alteration omitted) (quoting *United States v. Han*, 230 F.3d 560, 565 (2d Cir. 2000)). The district court properly instructed the jury on the jurisdictional element of a wire fraud offense. Scott's supplemental instruction was legally incorrect because the government was not required to trace the funds being laundered to the "proceeds" of a domestic wire fraud. *Cf. Zvi*, 168 F.3d at 56 (rejecting a "narrow definition of 'proceeds'" of the specified unlawful activity under 18 U.S.C. § 1956(a)(1)(B)(i), (a)(2)(B)(i)). Nor would it have been correct for the district court to instruct the jury that the fraud must have "occurred" in the United States. Regardless, the government offered evidence that an American victim wired money to a OneCoin depository account based in the United States, which then transferred her money to the Fenero Funds.

## D

There was sufficient evidence to support Scott's conviction for conspiracy to commit bank fraud. The evidence of the CryptoReal transaction, for example,

14a

*Appendix A*

allowed the jury to find that Scott conspired to commit bank fraud. That evidence included Konstantin Ignatov's testimony that OneCoin needed to use fake names when opening bank accounts because banks froze funds associated with OneCoin periodically; the testimony of leaders of financial institutions that, after learning that the Fenero Funds were connected to OneCoin, they held emergency meetings, informed regulators, and stopped doing business with entities affiliated with the Fenero Funds; the testimony of two American victims that OneCoin instructed them to "not include words like OneCoin investment, digital currency or cryptocurrency" when directing wire transfers and that, if asked about the purpose of the wire transfers, to "simply state educational training package," Scott App'x 68; emails in which Scott acknowledged that banks were unwilling to transfer funds derived from OneCoin because that "[m]ay raise serious AML anti-money laundering issues," *id.* at 497; evidence that Scott disguised a transfer of OneCoin proceeds to Ruja Ignatova as a loan;[1] and evidence that Scott knew that proceeds of OneCoin would be transferred through an American dollar correspondent bank.

Although the evidence concerning the CryptoReal transaction was alone sufficient for a rational jury to find Scott guilty of conspiracy to commit bank fraud, the government also presented evidence in connection with the Armenta transactions. *See Scott*, 2023 U.S. Dist. LEXIS 166362, 2023 WL 6064329, at *8-10. Scott argues that

---

[1]. Scott argues that the government never proved that his statement that the transaction was a "loan" was false. Scott Br. 53. The jury could infer, however, that if Scott were referring to a real loan, the loaned money would not have been considered available cash.

15a

Armenta's statements to his banks do not show that Scott conspired with Armenta to commit bank fraud, but the government also presented evidence that (1) Scott knew the Fenero Funds were not legitimate investment funds, (2) banks were refusing to process funds associated with OneCoin, and (3) the origin of the funds in Armenta's account was OneCoin. A rational jury could conclude that Scott knew that Armenta would be able to transfer the OneCoin funds only if Armenta lied to his banks.

## E

We further conclude that the venue was proper. The jury was presented with evidence that Scott was aware that both the CryptoReal and Armenta transactions used correspondent accounts based in New York. "[A]lthough the district court did not specifically instruct the jury as to the foreseeability of venue in the Southern District of New York, the evidence supporting that conclusion is so compelling that, if there was an error in that omission, it was plainly harmless." *United States v. Rommy*, 506 F.3d 108, 123 (2d Cir. 2007).

\* \* \*

We have considered Greenwood's and Scott's remaining arguments, which we conclude are without merit. For the foregoing reasons, we affirm the judgments of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

/s/ Catherine O'Hagan Wolfe

16a

## APPENDIX B — OPINION AND ORDER OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, FILED SEPTEMBER 14, 2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

17-cr-630 (ER)

UNITED STATES OF AMERICA

— against —

MARK S. SCOTT,

*Defendant.*

### OPINION & ORDER

RAMOS, D.J.:

Mark Scott was convicted on November 21, 2019 of conspiracy to commit bank fraud and conspiracy to commit money laundering. Before the Court are Scott's motions for a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33. For the reasons set forth below, the motions are DENIED.

17a

*Appendix B*

## I.  FACTUAL BACKGROUND & PROCEDURAL HISTORY

### A.  The OneCoin Scheme

OneCoin was founded in 2014 by Ruja Ignatov ("Ruja") and Sebastian Greenwood. Doc. 244 at 9. It is headquartered in Sofia, Bulgaria and began operating in the United States in or around 2015. *Id.* at 7. OneCoin markets and sells a purported digital cryptocurrency by the same name. *Id.* Approximately 3.5 million people have invested in OneCoin cryptocurrency packages, and OneCoin has taken in over $2 billion in proceeds. *Id.* It is undisputed that OneCoin is a fake cryptocurrency: it is in fact a global multi-level marketing pyramid scheme. *See* Doc. 477 (Apr. 25, 2022 Hr'g Tr.) at 4:12-21; Trial Tr.[1] at 1904:17-18 (Def. Summation) ("OneCoin is a scam. We're not going to fight that battle.").

In other words, OneCoin was an elaborate fraud premised on innumerable misrepresentations. For instance:

- OneCoin claimed that the cryptocurrency was "mined," and its value was based on market supply and demand: as more members joined OneCoin, demand for the tokens, and therefore their price, grew. Doc.

---

[1]. Docs. 185, 187, 189, 191, 193, 195, 197, 199, 201, 203, 205, 207, and 209 collectively comprise the full transcript of Scott's trial from November 4, 2019 to November 21, 2019. The Court cites them collectively as "Trial Tr."

18a

244 at 8. The purported value of a OneCoin grew steadily, without ever decreasing, from €0.50 to approximately €29.95 in January 2019. *Id.* In fact, OneCoins were not mined, but were instead auto-generated and distributed to members as needed. *Id.* at 9-10. Moreover, the value of OneCoin was set internally, not based on market supply and demand. *Id.* at 9.

- OneCoin alleged that it had a private "blockchain" (*i.e.*, digital ledger of tokens and transactions), which had even been externally audited. *Id.* at 8. In fact, the audit report was fake and had been created by OneCoin employees. *Id.*

- OneCoin also purported that it would have public and foreign exchanges to allow investors to buy, sell, or trade OneCoins for fiat currency and that it would have an investment fund where investors could invest OneCoin in real assets. *Id.* at 10. In fact, none of these representations were true. *Id.*

## B. Scott's Involvement with OneCoin

As financial institutions around the world began to recognize OneCoin as a fraud, they grew unwilling to provide banking services to OneCoin, preventing the organization from opening bank accounts in its name. *Id.*

19a

*Appendix B*

at 11. OneCoin needed to conceal the origin of its funds, as well as the purpose of the transfers into and out of its bank accounts. *Id.* Gilbert Armenta, Ruja's boyfriend and a money launderer for OneCoin, introduced Scott to Ruja as someone who could provide a solution to OneCoin's banking troubles in 2015. *Id.* Scott, a corporate lawyer who was then a partner at an internationally recognized law firm, had extensive experience representing private equity funds, and he leveraged that experience to construct an elaborate, sophisticated money laundering operation for OneCoin. *Id.*

In April 2016, before Scott received any OneCoin funds, Irina Dilkinska, OneCoin's chief money launderer, sent Scott an email of an article by a U.S.-based certified public accountant who detailed many indicia that OneCoin was a fraudulent pyramid scheme. Doc. 412 at 10-11. Scott was also informed that banks around the world had blocked OneCoin's accounts and that the City of London Police were investigating OneCoin. *Id.* at 11. Nonetheless, Scott agreed to work with OneCoin.

1. **Scott Set Up the Fenero Funds and Concealed All Traces of OneCoin Involvement**

From late 2015 to early 2016, Scott set up a series of investment funds in the British Virgin Islands and Cayman Islands (collectively, "the Fenero Funds"), each with its own offshore bank account in the Cayman Islands. Doc. 244 at 11-12. From May to October 2016, the Fenero Funds received wire transfers of €364 million

20a

and $10 million in alleged "investments." *Id.* at 13. The transfers originated from approximately ten different bank accounts, all for various shell corporations owned by OneCoin co-conspirators, held at banks in Singapore, Germany, Hong Kong, the United Kingdom, and the United States. *Id.* On paper, the shell corporations were "investors" in the Fenero Funds, but the money they transferred into the Fenero Funds was in fact all money derived from OneCoin. *Id.* In total, Scott laundered approximately $400 million of OneCoin proceeds through the Fenero Funds. *Id.* at 6.

Scott worked to meticulously conceal from the banks any connection between OneCoin and the purported investors in the Fenero Funds. *Id.* at 15. He knew that any reference to OneCoin would, in his words, "kill this for us." Doc. 412 at 9. Indeed, when a series of loans and suspicious transactions triggered Apex Group Ltd. ("Apex")—an investment fund administrator that Scott hired, which was responsible for conducting anti-money laundering and "Know Your Customer" checks—to conduct enhanced due diligence on the Fenero Funds in July and August 2016, Scott repeatedly lied to hide the connection between OneCoin and the Fenero Funds. Doc. 244 at 15-16. When Apex sought additional information on the source of wealth for the investors in the Fenero Funds, Scott drafted fraudulent letters of comfort for two other attorneys to put on their letterhead and sign, created and sent backdated wire instruction letters, and forged a series of agreements to attempt to justify the large volume of transfers to and from the Fenero Funds. *Id.* at 16-17. Scott went so far as to instruct Dilkinska

21a

*Appendix B*

to sign the documents with different pens and e-sign others to hide the forgeries. *Id.* at 17. Apex concluded the documents Scott provided were fraudulent and created to conceal the relationship with OneCoin. *Id.* Apex also held a series of emergency meetings and began to notify government agencies concerning OneCoin's involvement. *Id.* at 16. When Apex continued to refuse Scott's request to transfer funds out of the Fenero Funds, Scott demanded a phone call with Apex, during which he continued to lie to Apex about the source of the money in the Fenero Funds. *Id.* at 17-18.

> **2. Scott Lied to U.S. Federally Insured Banks to Effectuate Transfers of OneCoin Proceeds Into and Out of the Fenero Funds**

Three sets of fraudulent transactions were particularly relevant because of the involvement of U.S. federally insured banks.

> **a. The CryptoReal Loan (July 2016)**

In July 2016, Scott disguised the transfer of OneCoin funds by "loaning" $30 million from the Fenero Funds to CryptoReal Investments Trust Ltd. ("CryptoReal"). *Id.* at 18. Scott and another lawyer, Martin Breidenbach, represented to Apex that Breidenbach was the ultimate beneficial owner of CryptoReal (though the transfer was in fact of Ruja's funds and on her behalf), and that the loan was for CryptoReal to purchase an oil field in Madagascar from Barta Holdings Ltd. ("Barta"). *Id.* Because Apex

22a

transferred the funds in U.S. dollars ("USD") between CryptoReal's DMS Bank account in the Cayman Islands and Barta's DBS Bank account in Hong Kong, the transfer used a USD correspondent account at Bank of New York Mellon ("BNY Mellon") in Manhattan. *Id. at* 18-19. While neither Apex, DMS Bank (Cayman), or DBS Bank (Hong Kong) are federally insured, BNY Mellon is. Doc. 218 at 26.

### b. The Armenta Investment Transactions (June & September 2016)

In June 2016, Scott received transfers totaling approximately $5 million into the Fenero Funds from a U.S. Morgan Stanley account in the name of "Fates Group LLC," which was controlled by Gilbert Armenta. Doc. 244 at 19; *see also* Doc. 160, Ex. B (Gov't Oct. 7, 2019 Letter in Response to Scott's Request for Particulars).[2] Similarly, in September 2016, Scott received a transfer into the Fenero Funds of approximately $5 million from an account at U.S. Sabadell also in the name of "Fates Group LLC." *Id.* These transfers purported to be investments in the Fenero Funds, and Armenta represented to Morgan Stanley and Sabadell that the Fenero Funds were a private equity firm that invested in, among other things, renewable energy enterprises like windmills. Doc. 244 at 19. Despite knowing that his Fenero Funds were not legitimate investment funds, Scott had Armenta sign an investment agreement purporting that the transfers to

---

2.  The Government's October 7, 2019 letter was never filed on the docket, but it was emailed to the Court under seal when Scott attached it to his letter to the Court (Doc. 160). The Court cites to the sealed exhibit.

23a

*Appendix B*

the Fenero Funds were for investment purposes. *Id.* at 37 (citing GX[3] 1140). The Government alleged that Scott was aware of and complicit in Armenta's misrepresentations and knew that the funds were in fact OneCoin proceeds, not legitimate investments. *Id.*

## C.  Indictment and Arrest

On August 21, 2018, Scott was charged in a one count indictment for conspiracy to commit money laundering, and an arrest warrant was issued the same day. Docs. 6, 8. He was arrested on September 5, 2018. Doc. 11.

By superseding indictment, Scott was further charged with conspiracy to commit bank fraud on October 8, 2019. Doc. 143. Count Two read in full:

> From at least in or about September 2015 through in or about 2018, in the Southern District of New York and elsewhere, MARK S. SCOTT, the defendant, and others known and unknown, willfully and knowingly did combine conspire, confederate, and agree together and with each other to commit bank fraud, in violation of Title 18, United States Code, Section 1344.
>
> It was part and object of the conspiracy that MARK S. SCOTT, the defendant, and others

---

3. GX designates Government trial exhibits. DX designates Defense trial exhibits.

24a

known and unknown, willfully and knowingly, would and did execute and attempt to execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation ("FDIC"), and to obtain moneys, funds, credits, assets securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, to wit, SCOTT and others misrepresented and omitted material facts to banks and other financial institutions worldwide to cause those financial institutions, including FDIC-insured financial institutions in the United States, to transfer funds into and out of accounts associated with purported investment funds operated by SCOTT and others, in violation of Title 18, United States Code, Section 1344.

*Id.* ¶¶ 4-5.

### D.  Trial

Scott's trial lasted from November 5, 2019 to November 20, 2019. In addition to hundreds of exhibits, including dozens of Scott's own emails, the Government also offered the testimony of dozens of witnesses. Doc. 244 at 6-7. These witnesses included OneCoin victims; a money laundering expert; employees and directors of financial institutions; and a financial intelligence analyst who

25a

*Appendix B*

traced OneCoin's criminal proceeds through the Fenero Funds. *Id.* The Government also offered testimony from Konstantin Ignatov ("Konstantin"), Ruja's brother and one of OneCoin's top leaders, who testified as a cooperating witness for the Government. *Id.*

The bulk of Konstantin's testimony on direct examination concerned OneCoin's operations, including an explanation of its fraudulent multi-level marketing structure. Doc. 412 at 15-16. Konstantin also testified at a high level as to OneCoin's difficulties obtaining banking services and its use of money launders, including Scott, to circumvent those issues. *Id.* at 16. However, Konstantin had only met Scott once and had no substantive conversations with him. *Id.* The sole meeting occurred during a July 20, 2016 meeting between Scott, Ruja, and Dilkinska at the OneCoin office in Sofia ("the Meeting"). Trial Tr. at 243:24-247:7. Konstantin testified that Scott arrived at the office around noon and made small talk with Konstantin (who was at the time operating as Ruja's personal assistant); Konstantin got Scott something to drink and then escorted him into Ruja's office, at which point Konstantin left. *Id.* at 245:19-23. Ruja then asked Konstantin to bring in Dilkinska; he did so, and then left again. *Id.* at 245:24-246:6. Ruja then "called [Konstantin] again and told [him] to make sure that everybody on this floor leaves and goes home so that Irina [Dilkinska], Mark [Scott], and Ruja are alone." *Id.* at 246:8-10. Konstantin testified this was the only time Ruja ever cleared out an office floor. *Id.* at 246:11-13. Konstantin left with the others and did not participate in the meeting. *Id.* at 246:14-247:7. Indeed, Konstantin testified that his only knowledge of

26a

the discussions at the Meeting came second-hand from Dilkinska and Ruja and was merely that it lasted a "a long time . . . until Mark Scott understood everything that has to be done or he has to do." *Id.* at 246:25-247:1.

Konstantin also testified concerning events that transpired when he traveled to the United States to attend OneCoin-related meetings in Las Vegas in February 2019. He testified that when he arrived at the airport, a OneCoin laptop he was carrying was seized and then returned by a border patrol officer a short time later. *Id.* at 205:4-206:16. After he got the laptop back, Konstantin testified he "put [the laptop] into a paper trash bag with other trash items, and [he] took it to a trash bin on a busy place in the Las Vegas Strip, and [he] threw it away into the trash bin there." *Id.* at 206:20-23. He said he did so because he "was afraid that somebody might find more evidence connecting [him] to OneCoin." *Id.* at 206:25-207:1.

On cross-examination, Scott extensively impeached Konstantin about Konstantin's purported dishonesty and especially about his limited interactions with Scott. Doc. 412 at 16-17 (citing Trial Tr. at 302-06, 324-46, 404-18). For instance, Scott confirmed that Konstantin had only met Scott once; never spoke with Scott by phone call, text message, or WhatsApp; and that their limited email communications were merely about logistics concerning meetings between Scott and Ruja. Trial Tr. at 301:22-307:4. Moreover, Konstantin's understanding that Scott was a money launderer was based on information Dilkinska told him, but Konstantin did not have personal knowledge of Scott's involvement with OneCoin. *Id.* at

27a

*Appendix B*

404:19-405:8. Additionally, Konstantin was not present for nor was ever told the content of the discussions at the Meeting. *Id.* at 304:19-305:14. And, when Scott's counsel thrice pressed Konstantin whether he was "a hundred percent sure that Ms. Dilkinska was at" the Meeting, Konstantin said he was "pretty sure" but not a hundred percent. Trial Tr. at 304:3-18.

Scott was found guilty of both counts on November 21, 2019. Doc. 182.

**E.    Post-Trial**

Scott moved for a judgment of acquittal or, in the alternative, a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33 on February 4, 2020. Doc. 217. He alleged there was insufficient evidence to sustain a conviction on either count. *Id.* He further challenged whether venue was proper and alleged several errors with the jury instructions. *Id.*

On June 29, 2021, Duncan Arthur, a former OneCoin associate turned whistleblower, spoke briefly with and then emailed Matthew Winters, an investigator with the Manhattan District Attorney's Office (which had jointly investigated and prosecuted OneCoin alongside the U.S. Attorney's Office for the Southern District of New York), who was at that time assigned to work with the City of London Police. Docs. 433, 434-4, 434-15. Arthur reported that he had read Konstantin's testimony from Scott's trial, and that Konstantin had lied: specifically, he reported that Konstantin had not thrown the OneCoin laptop in the

28a

trash in Las Vegas as he testified but had in fact given it to Arthur to return it to OneCoin in Sofia. Doc. 434-4. Ten days later, on July 9, 2021, Arthur also reported Konstantin's perjury to Katri A. Stanley, a member of Scott's defense team at the law firm Covington & Burling LLP. Aug. 23, 2021 Stanley Decl. ¶¶ 1-2.

Based on Arthur's allegations, on August 23, 2021, Scott filed a supplemental motion for a new trial pursuant to Rule 33. Doc. 410. He argued that, had the jury known that Konstantin lied about the laptop, it would not have credited Konstantin's testimony nor, consequently, found Scott guilty of either offense. *Id.* Although Winters said he intended to immediately forward Arthur's email to the FBI, he inadvertently failed to do so until August 25, 2021—after Scott's supplemental motion. Doc. 434-4. The supplemental motion Scott filed was thus the first time that prosecutors became aware of the falsity of Konstantin's testimony about the laptop. Doc. 412 at 18-19.

On reply in support of his supplemental motion, Scott further argued that Konstantin also lied about the Meeting because Dilkinska had in fact been in India at the time when Konstantin testified that she was in Sofia meeting with Scott and Ruja. Doc. 433 at 14-16. Scott alleged that, after the Government's opposition to his supplemental motion was filed, "a source" provided Scott with a copy of Dilkinska's passport, and the stamps therein showed that she was in India during the same time that Konstantin alleged she was at the Meeting. *Id.* at 9. And on December 3, 2021, the Government confirmed to Scott the accuracy of the passport stamps; Dilkinska had arrived in India

29a

*Appendix B*

on July 19, 2016 and departed on July 22, 2016. *Id.* Scott further asked that the Court take into consideration that Konstantin breached his cooperation agreement by using a contraband cellphone at the Metropolitan Correctional Center ("MCC") and that the Government delayed in disclosing the violation to Scott. *Id.* at 10; Doc. 461 at 46.

## II.  LEGAL STANDARDS

### A.  Rule 29

Federal Rule of Criminal Procedure 29(a) directs the Court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." To succeed on a Rule 29(a) motion, the defendant must show, "considering all of the evidence, direct and circumstantial, that 'no rational trier of fact could have found the defendant guilty beyond a reasonable doubt.'" *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (quoting *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003)). Where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (citation omitted). It is not the trial court's role to "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (quoting *Curley v. United States*, 160 F.2d 229, 232, 81 U.S. App. D.C. 389 (D.C. Cir. 1947)). Accordingly, a "court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged

30a

is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (quoting *Guadagna*, 183 F.3d at 130). In assessing the sufficiency of the evidence supporting a guilty verdict, the Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (quoting *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008), *abrogated on other grounds by Dean v. United States*, 581 U.S. 62, 137 S. Ct. 1170, 197 L. Ed. 2d 490 (2017)). Therefore, a defendant challenging the sufficiency of the evidence that was the basis of his conviction at trial "bears a heavy burden" when bringing a Rule 29(a) motion. *Id.* (quoting *United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010)). The jury's verdict "may be based entirely on circumstantial evidence." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995) (citation omitted); *see also United States v. Aleskerova*, 300 F.3d 286, 292-93 (2d Cir. 2002).

The Court's "deference to the jury's findings is especially important" in conspiracy cases, "because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court." *Coplan*, 703 F.3d at 62 (quoting *United States v. Rojas*, 617 F.3d 669, 674 (2d Cir. 2010)). "In order to convict a defendant of the crime of conspiracy, the government must show that two or more persons entered into a joint enterprise for an unlawful purpose,

31a

*Appendix B*

with awareness of its general nature and extent." *United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010). "The record must . . . permit a rational jury to find: (1) the existence of the conspiracy charged; (2) that the defendant had knowledge of the conspiracy; and (3) that the defendant intentionally joined the conspiracy." *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008) (internal citations omitted). To prove a defendant joined a conspiracy, the government must show that he "knew of the conspiracy" and "joined it with the intent to commit the offenses that were its objectives." *United States v. Ceballos*, 340 F.3d 115, 123 (2d Cir. 2003) (internal citations omitted); *see also United States v. Lange*, 834 F.3d 58, 76 (2d Cir. 2016) ("On a charge of conspiracy, the Government must prove (1) knowing participation or membership in the scheme charged and (2) some knowledge of the unlawful aims and objectives of the scheme." (internal quotation marks and citation omitted)). "The government's proof of an agreement does not require evidence of a formal or express agreement; it is enough that the parties have a tacit understanding to carry out the prohibited conduct." *United States v. Nusraty*, 867 F.2d 759, 763 (2d Cir. 1989) (internal quotation marks and citation omitted). "The government need not prove the defendant's familiarity with all of the conspiracy's details; it may demonstrate simply the defendant's awareness of the 'general nature and extent' of the conspiracy." *United States v. Anderson*, 747 F.3d 51, 61 (2d Cir. 2014) (citation omitted). "[T]he elements of a conspiracy may be proved by circumstantial evidence." *United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir. 2003) (citation omitted). For example, a defendant's "knowing and willing participation in a conspiracy may

32a

be inferred from . . . [his] presence at critical stages of the conspiracy that could not be explained by happenstance, or a lack of surprise when discussing the conspiracy with others." *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 113 (2d Cir. 2008) (quoting *Aleskerova*, 300 F.3d at 293).

## B.  Rule 33

Federal Rule of Criminal Procedure 33 provides, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "[M]otions for a new trial are disfavored in this Circuit," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), and are granted "sparingly and in only the most extraordinary circumstances," *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotation marks and citation omitted). The Second Circuit has observed that to order a new trial under Rule 33, courts must be satisfied that "it would be a manifest injustice to let the guilty verdict stand." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) (quoting *United States v. Reed*, 875 F.2d 107, 114 (7th Cir. 1989)).

"The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is 'a real concern that an innocent person may have been convicted.'" *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (quoting *Ferguson*, 246 F.3d at 134). A new trial should not be granted when

33a

*Appendix B*

the court is "satisfied that competent, satisfactory, and sufficient evidence in the record supports the jury verdict." *Ferguson*, 246 F.3d at 134. In evaluating a Rule 33 motion, "[t]he district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation," of whether the defendant has met these onerous burdens. *Id.* Ultimately, "[Rule 33] motions are granted only in 'extraordinary circumstances,' and are committed to the trial court's discretion." *United States v. Torres*, 128 F.3d 38, 48 (2d Cir. 1997) (internal citations and quotation marks omitted).

The Second Circuit has "frequently acknowledged that, even where newly discovered evidence indicates perjury," a Rule 33 motion "should be granted only with great caution and in the most extraordinary circumstances." *United States v. Stewart*, 433 F.3d 273, 296-97 (2d Cir. 2006) (citations omitted). Even if a witness has committed perjury, "if the prosecution was not aware of the perjury [at the time of trial], a defendant can obtain a new trial only where the false testimony leads to a 'firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'" *Id.* (quoting *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991)). Where, however, the prosecution "knew or should have known of the perjury prior to the conclusion of the trial, the conviction must be set aside where there is 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Id* at 297 (quoting *Wallach*, 935 F.2d at 456). And, where the prosecution *knowingly* introduces false testimony, reversal is "virtually automatic." *Id.* (quoting *Wallach*, 935 F.2d at 456).

34a

Courts are especially reluctant to grant a new trial where the newly discovered evidence underlying a Rule 33 motion would function solely as additional impeachment material. "Relief under Rule 33 based on newly discovered evidence may be granted only upon a showing that . . . the evidence is not merely cumulative or impeaching; and . . . the evidence would likely result in an acquittal." *United States v. Forbes*, 790 F.3d 403, 406-07 (2d Cir. 2015) (citation omitted); *see also, e.g., United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996) ("[N]ew impeachment evidence is not material, and thus a new trial is not required when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." (internal quotation marks and citation omitted)). Similarly, Rule 33 motions are not the appropriate vehicle to relitigate evidentiary disputes. *United States v. Soto*, No. 12-cr-556 (RPP), 2014 U.S. Dist. LEXIS 60191, at *21 (S.D.N.Y. Apr. 28, 2014).

## III. ANALYSIS

### A. Scott's Motion for Acquittal or a New Trial Pursuant to Rule 29 on the Conspiracy to Commit Bank Fraud Count is Denied

To convict Scott on the charge of conspiracy to commit bank fraud, the Government had to prove that two or more persons entered a joint enterprise to commit bank fraud, and Scott knowingly and intentionally joined the enterprise. *See Torres*, 604 F.3d at 65; *Santos*, 541 F.3d at 70. A defendant commits bank fraud when he "knowingly executes, or attempts to execute, a scheme or artifice

35a

*Appendix B*

(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false of fraudulent pretenses, representations, or promises." 18 U.S.C § 1344. A "financial institution" includes federally insured banks. 18 U.S.C § 20. A defendant need not specifically intend to deceive the financial institution to be convicted under § 1344(2) for obtaining bank property by means of a false representation. *Loughrin v. United States*, 573 U.S. 351, 356-57, 134 S. Ct. 2384, 189 L. Ed. 2d 411 (2014). The false representation may be made to a third party and need not be made to the bank nor even the entity with custody and control of the property obtained, so long as the false representation is the "means of" obtaining the property. *See id.* at 363-64. A defendant obtains property "by means of" a false representation when his false statement "is the mechanism naturally inducing a bank (or custodian) to part with its money." *Id.* at 365 (comparing a defendant passing a fraudulent check to a third-party to cash at the bank, which is bank fraud, to a defendant selling a counterfeit purse and receiving a check to cash at the bank as payment, which is not bank fraud, because the bank's involvement in the fraudulent scheme in the latter is fortuitous, and the misrepresentation need not ever reach the bank).

As discussed below, the Government satisfied its burden, and Scott's arguments to the contrary are unavailing. Accordingly, neither acquittal nor a new trial is warranted as to Count Two, conspiracy to commit bank fraud.

36a

### 1. The Government Provided Sufficient Evidence to Prove Scott Guilty of Conspiracy to Commit Bank Fraud

In response to Scott's request for particulars, the Government identified that the transactions constituting bank fraud "include[d], *but [we]re not limited to*:" the July 2016 Fenero Funds loan to CryptoReal ("the CryptoReal Transaction") and the June and September 2016 investments into the Fenero Funds by Fates Group LLC, an entity controlled by Gilbert Armenta ("the Armenta Transactions"). Doc. 160, Ex. B (emphasis in original). Scott argues none of the three transactions constituted bank fraud. Doc. 218 at 18-28. The Court holds that the Government proved all three were bank fraud.

### a. The CryptoReal Transaction

Scott argues that the CryptoReal Transaction could not properly be the basis for a conspiracy to commit bank fraud conviction for three reasons. First, the Government failed to prove that the loan was not in fact for an oil field in Madagascar—in other words, the Government failed to prove that there was a false representation. Doc. 218 at 26. Second, he argues that, even if the loan was not for the purchase of an oil field, he did not make the false representation to BNY Mellon nor know that any New York correspondent account would be used. *Id.* at 26-28. Finally, on reply, Scott also argues that the false representation was not material, in that BNY Mellon would have processed the loan transaction even if Scott had explicitly stated that the money was OneCoin's. Doc. 275 at 9-10.

37a

*Appendix B*

The Government responds that the transfer was not a loan for an oil field, and Scott knew of both the misrepresentation and the use of the BNY Mellon New York correspondent account. Doc. 244 at 35. Moreover, BNY Mellon would not have transferred the funds through its correspondent account had it known that the funds were affiliated with OneCoin. *Id.* at 34; Doc. 281 at 2.

At trial, the Government presented evidence that the money the Fenero Funds transferred to CryptoReal was not a loan, and that Scott was aware of that, including an email from Scott to Dilinska and other OneCoin associates wherein Scott stated that the allegedly loaned money was "considered available cash for obvious reasons." *See, e.g.*, Doc. 281 at 4-6 (GX 1391); *see also* Trial Tr. at 1884:10-17 (Gov't Summation) ("[W]hen you make a real loan, when you loan money to someone, and it's real, that money is not available to you until they pay it back. That's obvious. That's common sense. But when it's a fake loan, and there is a fake loan agreement, and you're just sending the money where Ruja tells you to, the money is available. It's available cash. Scott knew that. You see it right here in this e-mail [GX 1391]."). In assessing the sufficiency of the evidence, the Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *Coplan*, 703 F.3d at 62 (quoting *Chavez*, 549 F.3d at 124). Accordingly, the Court finds that the Government sufficiently proved that Scott committed a false representation.

38a

Further, Scott's awareness of the use of a New York correspondent account is irrelevant, as he need not have specifically intended to deceive BNY Mellon to be convicted under § 1344(2). *See Loughrin*, 573 U.S. at 356-57. Nonetheless, the Government also presented evidence that Scott knew that an international USD transaction like the CryptoReal Transaction would use a U.S. correspondent account. *See, e.g.*, Trial Tr. at 1471-77 (Direct Testimony of David Wildner, U.S. Head of Anti-Money Laundering and Counterterrorist Financing for BNY Mellon) (discussing multiple Fenero Fund transactions involving BNY Mellon correspondent accounts in New York); Doc. 244 at 35 (citing GX 1441, a May 2016 email Scott sent himself of incoming wire instructions from DMS bank, indicating that USD transactions would be processed through BNY Mellon's correspondent account in New York). Crediting every inference that could have been drawn in the Government's favor, the Court finds that the Government sufficiently proved that Scott was aware of the involvement of a New York correspondent account in the CryptoReal Transaction.

Finally, the Government further offered testimony that, when BNY Mellon discovered OneCoin was operating through the Fenero Funds and other proxies, it prohibited the use of its accounts in connection with further transactions with several of those proxies. Trial Tr. at 1429:20-1444:11 (Wildner Direct). Accordingly, Scott is incorrect that, had he told BNY Mellon that the transaction was "payment to Ruja Ignatova [sic] for OneCoin proceeds," the bank would nonetheless have processed the transaction. *See* Doc. 275 at 10. As a result,

39a

## *Appendix B*

crediting every inference in the Government's favor, the Court finds that the Government sufficiently proved that Scott's false representation was material.

Consequently, the Government provided sufficient evidence that a reasonable juror could find Scott guilty of conspiracy to commit bank fraud as to the CryptoReal Transaction. *See Espaillet*, 380 F.3d at 718; *Autuori*, 212 F.3d at 114. The Court will not substitute its own determination of the weight of the evidence and reasonable inferences for that of the jury, and Scott's motion as to the CryptoReal Transaction is therefore denied. *Guadagna*, 183 F.3d at 129.

### b.    The Armenta Transactions

Scott argues that the Armenta Transactions could not properly be the basis for conspiracy to commit bank fraud for several reasons. First, he argues that the transactions and any associated misrepresentations were made solely by Armenta, and Scott was neither aware of, nor in any way colluding with, Armenta with regards to the misrepresentations. Doc. 218 at 18-21. In fact, Scott alleges Armenta was lying even to Scott about the transactions. *Id.* at 22-23. Furthermore, Scott argues that even Armenta's conduct itself did not constitute bank fraud because (1) he was not trying to "obtain" bank property but rather to transfer out his own property, (2) any misrepresentations were mere minor omissions, and (3) the misrepresentations were not material. *Id.* at 23-24. Scott relies on *United States v. Perez-Ceballos*, 907 F.3d 863 (5th Cir. 2018) in support of his argument that

40a

Armenta's transactions could not constitute bank fraud if he merely sought to part with his own funds. *Id.* at 24.

The Government responds that Scott was aware of and complicit in Armenta's lies. Doc. 244 at 36-37. Further, the Government argues that the money was Ruja's, not Armenta's; but, even if it had been Armenta's money, Scott's reliance on *Perez-Cebellos* is misplaced because as long as the funds were in the bank's custody, it was still bank fraud to lie in order to induce the bank to process the transfer. *Id.* at 37-39. Moreover, the banks would not have processed the alleged investment transactions had Scott and Armenta been honest about the relationship with OneCoin. *Id.*

> **i.    Scott Conspired with Armenta to Make False Representations to Morgan Stanley and Sabadell in Order to Obtain Property in the Banks' Custody and Control**

The Government adduced sufficient evidence at trial to find that Scott conspired with Armenta to commit bank fraud. At trial, the Government presented evidence that Scott worked with Armenta to effectuate the transactions and was aware of the misrepresentations made to Morgan Stanley and Sabadell. Scott knew that the Fenero Funds were not legitimate investment vehicles, knew that banks were refusing to process transactions involving OneCoin, and knew that the origin of the funds in Armenta's Fates Group accounts was OneCoin (because Scott himself was the one to direct the transfer to Armenta). Doc. 244 at 36-37; *see also* Trial Tr. at 842:5-865:24 (Direct

41a

*Appendix B*

Testimony of Senem Firuz, Project Manager in Risk & Control for Morgan Stanley); 915:6-924:18 (Direct Testimony of Moshe Kishore, Commercial Relationship Banker at Iberia Bank, F/K/A Sabadell). Accordingly, Scott knew Armenta would only be able to transfer the OneCoin funds if Armenta lied to the banks. *Id.* Indeed, the fact that Scott had Armenta sign an investment agreement purporting that the transfers to the Fenero Funds were for investment purposes, despite knowing that his Fenero Funds were not legitimate investment funds, demonstrates Scott's knowledge of and complicity in Armenta's misrepresentations to the banks. *See* Doc. 244 at 37 (citing GX 1140)

Further, the Court finds unavailing Scott's arguments that Armenta's representations were not false, but rather merely minor omissions. *See* Doc. 218 at 21-22. Scott suggests that, under the Government's theory, "any statement Mr. Armenta made short of telling the bank he was seeking to launder criminal funds would be bank fraud by omission." *Id.* at 21. But Scott and Armenta did not merely fail to inform Sabadell and Morgan Stanley about the true nature of the transactions. As noted above, they also affirmatively misrepresented that the Fenero Funds were legitimate private equity funds which were meant to invest in endeavors such as windmills and renewable energy. Moreover, the false representations were also material in that the banks would not have processed the transactions had Scott and Armenta disclosed their relationship with OneCoin. Doc. 281 at 2 (citing Trial Tr. at 229-31 (Konstantin Direct)); *see also* Trial Tr. at 842:5-865:2 (Firuz Direct); 915:6-924:18 (Kishore Direct).

42a

Accordingly, crediting every inference in the Government's favor, the Court finds that the Government sufficiently proved that Scott conspired with Armenta to make false representations to Morgan Stanley and Sabadell to induce the banks to effectuate the transfers to the Fenero Funds.

### ii. Scott's Reliance on *Perez-Ceballos* is Misplaced

Scott's argument that a bank fraud conviction was not proper because Armenta transferred money out of his own account, rather than transferring the bank's money into his account, is without merit. Scott argues the transactions are like those in *Perez-Ceballos*, which were held to be insufficient to sustain a conviction for bank fraud. Doc. 218 at 24.

Perez-Ceballos induced a federally insured bank to transfer her funds from her account at that bank to a brokerage account, the latter of which was not federally insured and which she had procured by extensive misrepresentations. *Perez-Ceballos*, 907 F.3d at 865-66. She was indicted for money laundering, as well as for bank fraud on the theory that her procurement of the brokerage account by misrepresentation exposed the insured bank to a risk of loss under 18 U.S.C. § 1344(1). *Id.* The jury acquitted Perez-Ceballos of money laundering but found her guilty of bank fraud. *Id.* The Firth Circuit reversed her bank fraud conviction on two bases: (1) the Government failed to adduce evidence that any false statements were made to the insured bank, and (2) Perez-Ceballos did not

43a

*Appendix B*

expose the bank to any risk of loss where the Government's theory was predicated on the funds being proceeds of money laundering, but Perez-Ceballos was acquitted of the money laundering charge. *Id.* at 868-69.

Besides the fact that *Perez-Ceballos* is not controlling in the Second Circuit, the Court finds Scott's conviction dissimilar from Perez-Ceballos' in several significant ways. First, Perez-Ceballos was charged only with bank fraud under 18 U.S.C. § 1344(1), defrauding a financial institution, and the Fifth Circuit therefore never considered whether her actions constituted bank fraud under § 1344(2), obtaining bank property by false representations. *Id.* at 867-68. Scott, however, was indicted under both theories, meaning a conviction could lie under either § 1344(1) or § 1344(2) (Doc. 143, ¶¶ 4-5); and the Government's arguments focus primarily on the latter (Doc. 244 at 37-39). Second, Scott does not argue that the alleged misrepresentations were not made directly to Morgan Stanley and Sabadell. *See* Doc. 218 at 21-22. Nor was he acquitted of money laundering. Doc. 182. Moreover, the critical deficiencies in Perez-Ceballos' prosecution for bank fraud were the Government's failures to adduce sufficient evidence of the false representations and risk of loss—not that the underlying transactions involved Perez-Ceballos' own funds, as Scott argues. *Compare Perez-Ceballos*, 907 F.3d at 868, *with* Doc. 218 at 24; *see also United States v. Nejad*, No. 18-cr-224 (AJN), 2019 U.S. Dist. LEXIS 211911, 2019 WL 6702361, at *14 (S.D.N.Y. Dec. 6, 2019) (citing *United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019)) (holding that a voluntary transfer of funds from one's own account can constitute a scheme to obtain

44a

funds under the bank's custody and control and thus be the basis for a bank fraud conviction).

Consequently, the Government provided sufficient evidence that a reasonable juror could find Scott guilty of conspiracy to commit bank fraud as to the Armenta Transactions, and Scott's motion as to these transactions is also denied. *See Espaillet*, 380 F.3d at 718; *Autuori*, 212 F.3d at 114; *Guadagna*, 183 F.3d at 129.

### 2.    Venue was Proper

Scott further argues that the Government failed to establish that venue was proper on the bank fraud count because it failed to prove an act in furtherance of the conspiracy took place within the Southern District of New York. Doc. 218 at 25. This argument is without merit. In a conspiracy prosecution, "venue is proper in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators," or where it was reasonably "foreseeable that such an act would occur." *United States v. Svoboda*, 347 F.3d 471, 483-84 (2d Cir. 2003) (internal quotation marks and citations omitted). For purposes of bank fraud, venue is proper where the transfer of funds through in-district bank accounts at financial institutions was part of the fraud scheme. *See United States v. Korolkov*, 870 F. Supp. 60, 63-64 (S.D.N.Y. 1994). The Government need only establish venue by a preponderance of the evidence. *United States v. Milton*, No. 21-cr-478 (ER), 2021 U.S. Dist. LEXIS 222150, at *8 (S.D.N.Y. Nov. 15, 2021) (citing *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989)).

45a

*Appendix B*

Here, the CryptoReal transaction was processed through BNY Mellon's Manhattan correspondent account. Trial Tr. at 1472:15-1475:13 (Wildner Direct Testimony). The Armenta Transaction involving Sabadell likewise went through a Manhattan correspondent account. Trial Tr. at 913:5-14 (Kishore Direct Testimony). Moreover, the Government adduced evidence that Scott was aware that international USD transactions would use U.S. correspondent accounts. *See, e.g.*, Trial Tr. at 1471-77 (Wildner Direct Testimony); Doc. 244 at 35 (citing GX 1441). Accordingly, a reasonable jury could find that the Government established venue as to Count Two. *See Espaillet*, 380 F.3d at 718; *Autuori*, 212 F.3d at 114; *Guadagna*, 183 F.3d at 129.

### 3. The Jury Instructions Were Proper, and No Constructive Amendment Occurred

Finally, Scott argues that he is entitled to acquittal or a new trial under Rule 29 because the Court failed to instruct the jury (1) which financial institutions were federally insured and (2) that an omission can only constitute a material misrepresentation for purposes of bank fraud where there is a duty to disclose. Doc. 218 at 29-31; Doc. 275 at 16-17. He alleges that the Government "invited jurors to convict on other bank fraud theories, never charged or specified in the Government's particulars letter," thus risking constructive amendment of the indictment, because the Court failed to instruct the jury that the Government's theory of bank fraud related only to Morgan Stanley, BNY Mellon, and Sabadell. Doc. 275 at 16. Scott expressed particular concern that the jury

46a

may have been confused by the abundance of evidence concerning Apex. Doc. 477 at 9:20-10:10, 12:13-13:15.

Under the Fifth Amendment Grand Jury Clause, "a defendant has the right to be tried only on charges contained in an indictment returned by a grand jury." *United States v. Wozniak*, 126 F.3d 105, 109 (2d Cir. 1997). "[W]hen the charge upon which the defendant is tried differs significantly from the charge upon which the grand jury voted," a constructive amendment occurs, and reversal is required. *United States v. Khalupsky*, 5 F.4th 279, 293 (2d Cir. 2021). "To prevail on a constructive amendment claim, a defendant must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir. 2003) (quoting *United States v. Frank*, 156 F.3d 332, 337 (2d Cir. 1998)); *see also United States v. D'Amelio*, 683 F.3d 412, 416, 419 (2d Cir. 2012) (holding that constructive amendment occurs where the evidence or jury instructions at trial created a "substantial likelihood" that the defendant was convicted of a crime "distinctly different" from that for which he was indicted). The Second Circuit has "consistently permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial." *United States v. Banki*, 685 F.3d 99, 118 (2d Cir. 2012) (quoting *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007)). Thus, the defendant must show that "the challenged evidence or jury instructions tied a defendant's conviction to 'behavior

47a

*Appendix B*

*entirely separate* from that identified in the indictment.'" *United States v. Bastian*, 770 F.3d 212, 223 (2d Cir. 2014) (emphasis added) (quoting *United States v. Danielson*, 199 F.3d 666, 670 (2d Cir. 1999)).

Here, the indictment does not limit the objects of the bank fraud conspiracy to BNY Mellon, Sabadell, and Morgan Stanley. *See* Doc. 143, ¶¶ 4-5. Thus, Scott has not demonstrated a "substantial likelihood" that he was convicted of a crime "distinctly different" or "entirely separate" from that for which he was indicted. *See Bastian*, 770 F.3d at 223; *D'Amelio*, 683 F.3d at 416, 419. And the Government's letter of particulars, to which Scott cites, stated that "[w]hile the Government has no obligation to prove any particular transaction or misrepresentation, these transactions include, *but are not limited to* [the CryptoReal Loan and Armenta Transactions]." Doc. 160, Ex. B (emphasis in original). Accordingly, through the letter, Scott was provided notice of the core of the criminality to be proven at trial, and the Government did not exceed the "significant flexibility in proof" it was accorded. *See Banki*, 685 F.3d at 118. Moreover, at the charge conference, though the Court declined to specify in the jury instructions that the only three objects of the bank fraud scheme could be Morgan Stanley, BNY Mellon, and Sabadell, it did instruct the jury that bank fraud could only arise in connection with a federally insured financial institution. Trial Tr. at 1639:1-1643:25 (Charge Conference); *see also id.* at 2006:10-18 (Jury Instructions). Consequently, the jury instructions did not permit the jury to find Scott guilty of conspiracy to commit bank fraud based upon any conduct related to Apex.

48a

Finally, the Court also finds unavailing Scott's arguments that the jury instructions were in error because the Court did not instruct that omissions could be false representations for purposes of bank fraud only where a duty to disclose existed. The law does not limit false representations by omission only to those in situations where there is a duty to disclose. *See United States v. Zarrab*, No. 15-cr-867 (RMB), 2016 U.S. Dist. LEXIS 153533, at *42-45 (S.D.N.Y. Oct. 17, 2016). The jury instructions were thus proper. Accordingly, neither acquittal nor a new trial is warranted based on alleged error in the instructions.

## B. Scott's Motion for Acquittal or a New Trial Under Rule 29 on the Conspiracy to Commit Money Laundering Count is Denied

To have convicted Scott of the crime of conspiracy to commit money laundering, the Government must have proven that two or more persons entered a joint enterprise to commit either[4] domestic or international concealment money laundering, and Scott knowingly and intentionally joined the enterprise. *See Torres*, 604 F.3d at 65; *Santos*, 541 F.3d at 70. A defendant commits domestic concealment money laundering when he:

> knowing that the property involved in a financial transaction represents the proceeds

---

4. Scott was indicted under both theories of conspiracy to commit money laundering. Doc. 143 ¶¶ 1-3. The jury could therefore find Scott guilty under either theory, without needing to find him guilty as to both, so long as it was unanimous as to which of the two types was proven. Trial Tr. at 1989:18-1990:4 (Jury Instructions).

49a

*Appendix B*

of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—. . . knowing that the transaction is designed in whole or in part—to conceal or disguise the nature, the location, the ownership or the control of the proceeds of specified unlawful activity.

18 U.S.C. § 1956(a)(1)(B)(i). A defendant commits international concealment money laundering when he:

transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—. . . knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

18 U.S.C. § 1956(a)(2)(B)(i). Under either theory, the Government must prove beyond a reasonable doubt that the defendant knew that (1) the property, funds, or monetary instrument at issue were the proceeds of unlawful activity, and (2) the transaction, transportation,

50a

transmission, or transfer was designed to conceal or disguise the nature, location, ownership, or control of the proceeds. *See United States v. Odiase*, 788 F. App'x 760, 762 (2d Cir. 2019) (citing *United States v. Huezo*, 546 F.3d 174, 178-79 (2d Cir. 2008)); *United States v. Ness*, 565 F.3d 73, 77 (2d Cir. 2009). Both types of concealment money laundering also require that the funds at issue be proceeds of specified unlawful activity—here, wire fraud. The elements of wire fraud are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of . . . wires to further the scheme." *United States v. Calderon*, 944 F.3d 72, 85 (2d Cir. 2019) (alteration in original) (quoting *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004)).

Scott argues that he is entitled to an acquittal or new trial because the Government failed to prove: (1) the existence of wire fraud because it failed to establish a sufficient nexus to the United States, and wire fraud has no extraterritorial application; (2) that Scott's transactions with the Fenero Funds were the proceeds of wire fraud; (3) that Scott knew the transactions were proceeds of wire fraud; and (4) that Scott knew the transactions were designed to conceal or disguise the proceeds. *See* Doc. 218 at 34-42. Scott further challenges that the Court erred in failing to instruct the jury that wire fraud may not be based on entirely extraterritorial acts. *Id.* at 42-43. The Government argues that it satisfied its burden of proof as to each element of conspiracy to commit money laundering and the underlying wire fraud, and that the jury instructions were proper. Doc. 244 at 25-32.

51a

*Appendix B*

The Court finds that the Government adduced sufficient evidence at trial to find that Scott knowingly concealed or disguised proceeds of wire fraud through the Fenero Funds transactions. Scott first argues that the Government's sole evidence of domestic wire fraud was the testimony of two U.S. OneCoin victims, who collectively wired OneCoin approximately $50,000. Doc. 218 at 35-36. But as the Government estimated OneCoin's sales at millions (if not billions) of dollars, such a miniscule percentage of OneCoin sales in the United States is insufficient because a domestic application of wire fraud requires that a "substantial amount of conduct [occur] in the United States." *Id.* (citing *United States v. Gasperini*, No. 16-cr-441 (NGG), 2017 U.S. Dist. LEXIS 84116, 2017 WL 2399693, at *8 (E.D.N.Y. June 1, 2017)). Scott misrepresents the trial evidence. The Government's evidence demonstrated that OneCoin was not a purely extraterritorial wire fraud scheme; rather, it included testimony from two U.S. victims of OneCoin about their investments in the scheme and the promoters who introduced them to OneCoin, testimony regarding OneCoin meetings and conferences in the United States promoting OneCoin (including a trip by Konstantin to Las Vegas to conduct OneCoin-related meetings), and individuals transmitting wires internationally in connection with OneCoin's U.S. activities. *See, e.g.*, Trial Tr. at 73:20-75:12, 79:17-84:16 (Direct Testimony of William Horn, OneCoin victim) (testifying that he made multiple wire transfers for OneCoin packages from his account at the American Bank and Trust of the Cumberlands, and he told the bank, per OneCoin's instructions, that the wire was for educational material); Trial Tr. at 791:8-18, 796:4-797:23, 798:22-

52a

802:23, 809:15-810:2 (Direct Testimony of Linda Cohen, OneCoin victim) (testifying that she purchased multiple OneCoin packages from her HSBC bank account and that the loss of the money she sent to OneCoin prevented her from retiring). Accordingly, OneCoin's use of United States wires constitutes an execution of the wire fraud scheme in the United States. *See Bascuñán v. Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019) ("We therefore hold that a claim predicated on mail or wire fraud involves sufficient domestic conduct when (1) the defendant used domestic mail or wires in furtherance of a scheme to defraud, and (2) the use of the mail or wires was a core component of the scheme to defraud."); *United States v. Hayes*, 99 F. Supp. 3d 409, 421 (S.D.N.Y. 2015) (citing *Pasquantino v. United States*, 544 U.S. 349, 371, 125 S. Ct. 1766, 161 L. Ed. 2d 619 (2005) and collecting cases involving international wire fraud schemes prosecuted in the United States based on their use of interstate wires in furtherance of the fraudulent scheme). Scott's cited authority does not require that the Court parse the percentage of fraudulent proceeds obtained in the United States, as compared to abroad. Rather, it simply states that a fraud carried out entirely outside the United States, with absolutely no domestic nexus except a tangential and limited use of some U.S. wires, is insufficient for domestic application of wire fraud. *Gasperini*, 2017 U.S. Dist. LEXIS 84116, 2017 WL 2399693, at *8. And here, OneCoin specifically targeted victims in the United States and carried out elements of its fraudulent scheme in the United States (Trial Tr. at 73:20-75:12, 79:17-84:16 (Horn Direct), 791:8-18, 796:4-797:23, 798:22-802:23, 809:15-810:2 (Cohen Direct)), which is sufficient for domestic application of wire fraud, *Hayes*,

53a

*Appendix B*

99 F. Supp. 3d at 421. Thus, the Government sufficiently proved a nexus to the United States.

Second, Scott argues that the Government needed to establish that the transfers into the Fenero Funds were specifically of the proceeds of the wire fraud against OneCoin's *U.S.* victims. Doc. 218 at 36-38. But Scott cites no authority in his principal brief, nor on reply, for the assertion that the Government was required to conduct financial tracing at such a level of detail. *See id.*; Doc. 275 at 14-15. This alone is reason to reject Scott's argument. Moreover, the Government offered evidence at trial that both Horn and Cohen wired money to a U.S.-based OneCoin depository account, which subsequently directly and indirectly transferred money to the Fenero Funds. *See* Doc. 281 at 3; Trial Tr. at 1691:21-1695:19 (Direct Testimony of Rosalind October, Senior Financial Analyst in the Major Economic Crimes Bureau of the Manhattan District Attorney's Office).[5] The Court thus need not decide whether Scott's conviction would have been deficient had the Government not offered such evidence.

Third, Scott argues that the Government failed to prove he knew that the Fenero Funds transfers were the proceeds of unlawful activity (*i.e.*, wire fraud). Doc. 218

---

5. Based on the same mistaken arguments that the Government failed to demonstrate that the U.S. victims' money was traceable to the Fenero Funds, Scott also argues in passing that the Government failed to sufficiently establish venue under 18 U.S.C. § 1956(i). Doc. 218 at 42. Because a reasonable juror could have credited the Government's evidence tracing the victims' funds, Scott's argument as to venue fails.

54a

at 39-40. Specifically, he argues that, because wire fraud has no extraterritorial application, only OneCoin's conduct in the U.S. and its proceeds therefrom was cognizable as unlawful for purposes of a money laundering conviction. *Id.* at 40. Consequently, Scott argues that the Government therefore needed to prove that he specifically knew that the transfers were of proceeds from OneCoin's *U.S.* activities, but it failed to prove that Scott knew OneCoin had any U.S. connection. *Id.* Again, Scott cites no authority for the proposition that the OneCoin funds were proceeds of unlawful activity only insofar as the wire fraud was against U.S. victims, nor that the Government therefore needed to prove his knowledge at such a level of detail. And, again, this alone is reason enough to reject Scott's argument. Moreover, the argument is inconsistent with the law. First, to satisfy its burden to prove scienter under the money laundering statute, the Government needed only to prove that Scott knew he was "dealing with the proceeds of some crime, even if he [did] not know precisely which crime." *United States v. Prevezon Holdings Ltd.*, 122 F. Supp. 3d 57, 74 (S.D.N.Y. 2015) (internal brackets omitted) (quoting *United States v. Tillman*, 419 F. App'x 110, 111-12 (2d Cir. Apr. 15, 2011) (summary order)). Therefore, even if the only the money cognizable as proceeds of wire fraud was that obtained from the U.S. victims, the Government did not need to prove that Scott knew the Fenero Funds transfers were proceeds specifically of wire fraud (*i.e.*, from U.S. victims), as opposed to other unlawful activity. *See id.* And the Government presented ample evidence that Scott knew that OneCoin funds were

55a

*Appendix B*

the product of fraud and criminal activity.[6] *See* Doc. 244 at 25-27. Furthermore, wire fraud considers the larger fraudulent scheme, not merely individual transactions, and global money laundering and fraud schemes with domestic actors, wires, or effects can thus be properly reached through the wire fraud statute. *See United States v. Napout*, 963 F.3d 163, 180-81 (2d Cir. 2020); *Bascuñán*, 927 F.3d at 123. Consequently, Scott is incorrect that only the money from U.S. victims was cognizable as the proceeds of wire fraud where the global OneCoin scheme was indisputably fraudulent and intentionally targeted, in part, the United States, using U.S. wires and with at least some U.S.-based actors. Accordingly, the Government need not have proven that Scott knew the Fenero Fund transfers were proceeds of OneCoin's U.S. activity.

Fourth, Scott argues that the Government failed to prove that he knew the Fenero Funds transactions were designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity. Doc. 218 at 40-42. But the Government offered overwhelming evidence at trial that Scott meticulously concealed any connection between the Fenero Funds and OneCoin because he recognized that, in his words, "the

---

6. Scott maintains that he believed OneCoin was a reputable organization. Doc. 218 at 39-40. But, on a Rule 29 motion, the Court must view the evidence in the light most favorable to the Government and credit every inference that could have been drawn in the Government's favor. And a reasonable juror could easily have found that Scott knew OneCoin was a fraud, so the Court will not disrupt the jury's assessment of the weight of the evidence. *See id.; Espaillet*, 380 F.3d at 718.

56a

link to OneCoin will kill us." Doc. 244 at 27-28 (citing GX 1041, 1289, 1434). And Scott created a highly complex and sophisticated structure to receive and transfer OneCoin proceeds, involving layering the funds through multiple international bank accounts and forging papers to create an inaccurate paper trail that concealed the transactions' true nature and source—conduct the Government's expert described as prototypical money laundering behavior. *See id.* (citing GX 1175, 1177, 1209, 1388, 1391, 2270, 2276, 2602, 2602-A); Trial Tr. at 459:12-461:21, 463:13-481:9 (Direct Testimony of Donald Semesky, Anti-Money Laundering Compliance and Investigations Independent Consultant). Accordingly, crediting every inference that could have been drawn in the Government's favor, the Court finds that the Government sufficiently proved that Scott knew the transactions were designed to conceal the nature, source, and ownership of the funds.

Finally, the Court also finds unavailing Scott's arguments that the jury instructions were in error because it did not grant his request for a supplemental jury instruction that "in order for proceeds to be the proceeds of a specified unlawful activity, the funds have to be proceeds of a fraudulent scheme that occurred in the United States." Doc. 181 (Nov. 20, 2019 Def. Request for Suppl. Jury Instruction) at 2; Doc. 218 at 43. But, as discussed above, such a jury instruction misstates the law. *See Napout*, 963 F.3d at 180-81; *Bascuñán*, 927 F.3d at 123; *Prevezon Holdings Ltd.*, 122 F. Supp. 3d at 74. The jury instructions were thus proper. Accordingly, neither acquittal nor a new trial is warranted based on alleged error in the instructions.

57a

*Appendix B*

Thus, crediting every inference that could have been drawn in the Government's favor, the Court finds that the Government sufficiently proved that Scott was guilty of conspiracy to commit money laundering. Scott's motion for an acquittal or new trial under Rule 29 is denied.

### C.  Scott's Motion for a New Trial Pursuant to Rule 33 is Denied

In addition to the grounds for relief under Rule 29, Scott's opening motion also requests a new trial under Rule 33 in the interests of justice. *See* Doc. 218. By supplemental motion, Scott further moves for a new trial in light of the new evidence of Konstantin's perjury and post-trial misconduct. Doc. 410. The Court finds Scott's Rule 33 arguments meritless and declines to exercise its discretion to order a new trial, as it does not have "a real concern that an innocent person may have been convicted." *See McCourty*, 562 F.3d at 475; *Torres*, 128 F.3d at 48.

### 1.  Konstantin's Perjury Regarding the Laptop Does Not Warrant a New Trial

At trial, Konstantin testified that, when he traveled to the United States to attend OneCoin-related meetings in Las Vegas in February 2019, a OneCoin laptop was seized and then returned by a border patrol officer. Trial Tr. at 205:9-207:7. Upon its return, Konstantin testified he put the laptop into a paper trash bag with other trash items and threw it into a trash bin on a busy place in the Las Vegas Strip. Trial Tr. at 206:20-23. In the summer of 2021, Scott discovered Konstantin had lied about throwing

58a

away the laptop, as Konstantin had in fact given it to one of his associates, Duncan Arthur, to return to Bulgaria. Doc. 434-4. Scott argues this newly discovered evidence of perjury entitles him to a new trial because Konstantin was a key government witness, the jury would not have credited any of Konstantin's testimony had it known of this perjury, and it therefore would not have found Scott guilty. Doc. 410. The Government, however, argues that Konstantin's testimony regarding the disposition of the laptop—which occurred after Scott's crimes—was not material to the jury's verdict, and Scott extensively impeached Konstantin at trial, so evidence of any perjury related to the laptop would merely have been cumulative. Doc. 412.

Rule 33 motions, including those based on newly discovered evidence of perjury, are disfavored and granted only sparingly and with great caution in the most extraordinary circumstances. *Stewart*, 433 F.3d at 296-97; *Ferguson*, 246 F.3d at 134; *Gambino*, 59 F.3d at 364. Accordingly, where the Government was unaware of the perjury at the time of trial, the motion will be denied absent a "firm belief" the defendant would most likely not have been convicted but for the perjury. *Stewart*, 433 F.3d at 296-97 (quoting *Wallach*, 935 F.2d at 456). If the Government knew or should have known of the perjury before the conclusion of the trial, the motion will be granted if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id* at 297 (quoting *Wallach*, 935 F.2d at 456). And, if the Government knew of the perjury when offered, reversal is "virtually automatic." *Id.* (quoting *Wallach*,

59a

*Appendix B*

935 F.2d at 456). Moreover, Rule 33 motions will not be granted where the newly discovered evidence is merely cumulative or impeaching. *Forbes*, 790 F.3d at 406-07; *Wong*, 78 F.3d at 79.

The Government does not dispute that Konstantin's testimony regarding the laptop was perjurious (not merely mistaken), nor that the perjury is newly discovered, and Scott could not have discovered the perjury before or during the trial. *See* Doc. 412 at 22. Additionally, Scott does not argue that the Government knew of Konstantin's perjury, merely that it *should* have known (Doc. 433 at 17), though the Government argues that it did not and could not have known of the perjury before Arthur's disclosure in the summer of 2021 (Doc. 445 at 60-61). Accordingly, at minimum, Scott must establish a "reasonable likelihood" that Konstantin's perjury regarding the laptop could have affected the jury's verdict. *See Stewart*, 433 F.3d at 297. He has failed to do so.

The entirety of Konstantin's testimony regarding the laptop was such a small part of his testimony as to be negligible—covering, at most, one or two pages of his testimony, which spanned over three hundred pages in the trial transcript. *Compare* Trial Tr. at 205:25-207:1 (laptop testimony), *with* 125:4-446:23 (Konstantin Direct, Cross, Redirect, and Recross). Moreover, the disposition of the laptop was a purely collateral matter and was thus unlikely to have impacted the jury's determination of Scott's guilt. In fact, given that Konstantin's testimony focused primarily on the nature and conduct of OneCoin's operations rather than of Scott's participation, and given

60a

the overwhelming additional evidence that the Government presented at trial (as discussed above), the Court does not find that Konstantin's testimony, even taken as a whole, was primarily determinative of Scott's guilt. The Court's conclusion is reinforced by Scott's extensive impeachment of Konstantin, including on much more significant topics more relevant to the jury's determination of Scott's guilt. *See, e.g.*, Trial Tr. at 301:22-307:4 (Konstantin had limited interaction with Scott, was not present at the Meeting nor ever told what was discussed, and he could not be "a hundred percent sure" that Dilkinska was present); 404:19-413:18 (Konstantin lacked personal knowledge of Scott). The newly discovered evidence of perjury concerning the laptop would therefore have been merely cumulative or impeaching and is not a basis to grant Scott a new trial. *See Forbes*, 790 F.3d at 406-07; *Wong*, 78 F.3d at 79. Accordingly, Scott's motion for a new trial pursuant to Rule 33 on the basis of the newly discovered evidence of Konstantin's perjury regarding the laptop is denied.[7]

### 2.  No Other Basis for a New Trial Under Rule 33 Exists

Scott makes several other wide-ranging arguments under Rule 33, none of which the Court finds availing. Scott argues that Konstantin also perjured himself with regard to the Meeting—the July 20, 2016 meeting between Scott, Ruja, and Dilkinska at the OneCoin office in Sofia.

---

7.  Scott asks in the alternative for an evidentiary hearing. Doc. 410 at 7. The Court does not find that such hearing is necessary as there is no dispute as to the relevant facts and therefore denies the request.

61a

*Appendix B*

Doc. 433 at 14-16; *see also* Doc. 461 at 11-18. Although Konstantin did not participate in the Meeting, nor consequently testify regarding what was discussed, he did testify that after Scott arrived at the office, he made small talk with Scott and escorted him into Ruja's office; Ruja then had Konstantin bring in Dilkinska, clear the floor, and leave. Trial Tr. at 245:19-246:15. Scott argues this testimony has "now conclusively been established as an outright lie" because Dilkinska was in India between July 19 and July 22, as corroborated by her passport stamps and the Indian authorities, and Konstantin's testimony was too detailed to be a mistake. Doc. 433 at 15. And the alleged perjury impacted the jury's verdict because the Meeting was the only time Konstantin met Scott face-to-face and the only alleged meeting between Scott and Dilkinska, so the jury would not have found Scott guilty without Konstantin's testimony. *Id.* at 16, 22.

Scott also argues that he made a specific *Brady* request the day after Konstantin's testimony for information regarding the Meeting and Dilkinska's whereabouts, but the Government inadequately responded and instead opposed the introduction of two emails ("the Emails") into evidence that would have made clear that Dilkinska was in India during the Meeting. *Id.* at 17. Relatedly, Scott argues the Court's exclusion of the Emails was erroneous and provides a further basis for a new trial. *Id.* at 23-27. Accordingly, Scott argues that Konstantin's perjury and the Government's failure to correct require a new trial. *Id.* at 27-30. Finally, Scott also argues that Investigator Winters' delay in forwarding Arthur's information to the Government and to Scott, as well as the Government's

62a

delay disclosing Konstantin's post-trial breach of his cooperation agreement via his use of an illicit phone at the MCC, further warrant a new trial in the interests of justice. *Id.* at 30-34.

The Government responds that Scott has not established that Konstantin perjured himself about the Meeting, rather than being merely mistaken about the exact details of the timing; and the alleged perjury is cumulative impeachment that does not require a new trial. Doc. 445 at 38-51. Further, at least one of the Emails was properly excluded, but the Emails and passport stamps are, in any event, not "newly discovered," and evidentiary disputes are not proper bases for Rule 33 motions. *Id.* at 25-29. Moreover, it argues it did not violate any of its disclosure obligations regarding Dilkinska's whereabouts during the Meeting. *Id.* at 58-59. Nor did it suppress or withhold any information regarding the laptop or MCC phone but in fact acted promptly. *Id.* at 60-61.

> **a. Scott Has Not Established that Konstantin Committed Perjury with Regards to the Meeting, nor that the Government Knew of the Alleged Perjury, or that a New Trial is Warranted Because of It**

The Court does not find that Scott has established Konstantin's testimony regarding the Meeting was perjurious; but, even if it was, the Court does not find

63a

*Appendix B*

that Rule 33 requires a new trial. Newly discovered[8] evidence of perjury may be the basis for a new trial under Rule 33. *See Stewart*, 433 F.3d at 296-97. "A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory." *United States v. Ng Lap Seng*, No. 15-cr-706 (VSB), 2018 U.S. Dist. LEXIS 83441, at \*46-47 (S.D.N.Y. May 9, 2018)

---

8. The Government argues that Scott's arguments as to the Meeting are untimely because Scott attended the Meeting and therefore knew all along that Konstantin's testimony about Dilkinska's presence was mistaken. Doc. 445 at 33. Because Scott was on notice of the facts at the time of the testimony during trial, it argues that the evidence of Konstantin's purported perjury cannot now be newly discovered and therefore is not timely. *Id.* at 33-38. Scott responds that newly discovered evidence is required to file a timely Rule 33 motion (here, Arthur's new evidence about the laptop), but once a timely motion has been filed, he can raise arguments other than those about the new evidence, and the Court therefore need not find that evidence of the purported Meeting perjury is newly discovered. Doc. 461 at 19. But Scott argues that Dilkinska's passport *is* new evidence, which the Government only disclosed to Scott in December 2021 and which Scott could not have previously discovered through the exercise of due diligence because it was obtained through international law enforcement channels not available to the defense. *Id.* at 20.

Ultimately, the Court need not decide whether Scott's argument is untimely notwithstanding the timeliness of his broader Rule 33 motion because the argument is, in any event, not meritorious. But the Court emphasizes that the Government's position is without merit. The Government has not shown that Scott had access to Dilkinska's passport at trial nor even that it knew the passport would be relevant evidence.

64a

(quoting *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001)). The defendant bears the burden to prove perjury by a preponderance of the evidence. *Id.* at \*47 (citing *Cunningham v. Bennett*, No. 02-cv-4635 (ARR), 2005 U.S. Dist. LEXIS 26567, 2005 WL 1162475, at \*8 (E.D.N.Y. May 16, 2005)). Scott has not done so here. While the passport stamps and confirmation from the Indian authorities do evidence that Konstantin's testimony was wrong about Dilkinska being in Sofia at the Meeting, they do not necessarily prove that the testimony was perjury—that Konstantin gave false testimony *with willful intent*. Konstantin indicated on cross that he was "pretty sure" that Dilkinska was there, but he did not answer in the affirmative when Scott repeatedly asked if he was "a hundred percent sure." Trial Tr. at 304:3-18. And the Government points to evidence suggesting that Konstantin may have merely been mistaken of the date of the meeting—that Scott met with Ruja and Dilkinska in September 2016, not July 2016, or Dilkinska attended by phone rather than in person. Doc. 445 at 41. In turn, Scott insists that it is "exceedingly unlikely" that Scott met Dilkinska in September 2016, even considering the evidence to which the Government points. Doc. 461 at 13. But, even if it is true that Scott did not meet Dilkinska in September 2016, the Court remains unpersuaded that Scott has satisfied his burden of proving by a preponderance of evidence that Konstantin willfully lied about the Meeting. Accordingly, Scott is not entitled to a new trial based on this alleged perjury. *See Ng Lap Seng*, 2018 U.S. Dist. LEXIS 83441, at \*46-48.

Moreover, even if Konstantin *had* perjured himself with respect to his testimony about the Meeting, "[p]erjury

65a

*Appendix B*

in and of itself is insufficient to justify relief under Rule 33"; the defendant must further establish the requisite level of materiality (which depends on the extent of the Government's knowledge of the perjury). *Ng Lap Seng*, 2018 U.S. Dist. LEXIS 83441, at \*47-48. Here, Scott argues that the Government knowingly offered false testimony and a new trial is therefore "virtually automatic" under *Wallach*. Doc. 461 at 25-29. And, while the Government suggests that *at most* it should have known Dilkinska was not in Sofia on July 20, 2016, but it insists it did not know Konstantin intentionally testified falsely. Doc. 445 at 45. Scott responds that the language of *Wallach* does not require that Government knew Konstantin *intentionally* testified falsely, so long as it knew the testimony was false (even if accidental), and he further argues that *Wallach* is triggered even if the Government merely *should have* known the testimony was false. Doc. 461 at 25-29. But *Wallach* says:

> Where the prosecution knew or should have known of the perjury, the conviction must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is "virtually automatic."

935 F.2d at 456 (internal citations omitted). Accordingly, the plain language of *Wallach* belies Scott's arguments that reversal is virtually automatic even if the Government only should have known of even unintentionally false testimony. *See id.* Reversal is therefore not "virtually

66a

automatic" here, and the Court instead considers whether Scott has established that there exists "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.*

But the Court does not find such likelihood exists. On cross, Scott elicited from Konstantin his lack of definitive certainty of Dilkinska's presence at the Meeting, and, even on direct, Konstantin only ever testified that the Meeting occurred but provided no information as what was discussed at the Meeting. *See* Trial Tr. at 246:14-247:7, 304:3-18. Moreover, ample other evidence existed both of Scott's involvement with Ruja and Dilkinska and, more generally, of his guilt. *See, e.g.*, Doc. 445 at 48-51. Consequently, the newly discovered evidence of Konstantin's alleged Meeting-related perjury would, at most, have been cumulative impeachment material. *See Forbes*, 790 F.3d at 406-07 ("Relief under Rule 33 based on newly discovered evidence may be granted only upon a showing that . . . the evidence is not merely cumulative or impeaching; and . . . the evidence would likely result in an acquittal." (quotation marks omitted)); *Wong*, 78 F.3d at 79 ("[N]ew impeachment evidence is not material, and thus a new trial is not required when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." (internal quotation marks omitted)). The Court does not believe "it would be a manifest injustice to let the guilty verdict stand," *Sanchez*, 969 F.2d at 1414, and is "satisfied that competent, satisfactory, and sufficient evidence in the record supports the jury verdict," *Ferguson*, 246 F.3d at 134.

67a

*Appendix B*

**b.  Neither the Court's Exclusion of the Emails Nor the Government's Alleged Disclosure Violations Require a New Trial**

Scott's arguments as to the exclusion of the Emails and his allegations of the Government's disclosure violations are no more successful. First, the Court notes that Rule 33 motions are not the appropriate vehicles to relitigate evidentiary disputes. *See Soto*, 2014 U.S. Dist. LEXIS 60191, at *21. Accordingly, it need not reconsider at this time whether the Emails were properly excluded. Second, the Court does not find that the exclusion, even if in error, had any impact on the jury's verdict since, as discussed above, Konstantin disclaimed any knowledge of the substance of the Meeting. And Scott has not satisfied the requirement to show under Rule 33 "a manifest injustice." *See United States v. Mejia*, 948 F. Supp. 2d 311, 319 (S.D.N.Y. 2013) ("Even if the Court erred in excluding the hearsay testimony, Defendant still has not met his 'heavy burden' under Rule 29, [*United States v.*] *Broxmeyer*, 616 F.3d [120,] 125 [(2d Cir. 2010)], nor demonstrated that it would be a 'manifest injustice' to let the verdict stand under Rule 33, *Sanchez*, 969 F.2d at 1414.").

Finally, Scott makes three accusations of Government misconduct with respect to its disclosures: (1) the Government's delay in disclosing pretrial one of its batches of pretrial *Brady* materials with documents from Greenwood's electronic devices, (2) Winters' delay forwarding Arthur's statement concerning Konstantin's laptop, and (3) the Government's delay disclosing Konstantin's use of the MCC phone in violation of his

68a

cooperation agreement. Doc. 461 at 42-47. Although he does not argue that any of the three instances of alleged misconduct independently require a new trial under Rule 33, he asks the Court to consider his other Rule 29 and Rule 33 arguments in light of this "pattern" of misconduct. *Id.* at 42. Even if the Court were to find that the Government did not disclose the Greenwood documents, Arthur's statement, or Konstantin's use of a cellphone in the MCC as expeditiously as it could have, Scott has not established that any of those delays prejudiced him or rendered the jury's verdict unjust. Thus, the Court does not find that these three allegations of misconduct, even if true, alter its holdings as to Scott's arguments for acquittal or for a new trial.

Accordingly, none of Scott's arguments satisfy his heavy burden under Rule 33 to convince the Court that "a real concern that an innocent person may have been convicted." *McCourty*, 562 F.3d at 475 (quoting *Ferguson*, 246 F.3d at 134). Considering the totality of the circumstances, *see Ferguson*, 246 F.3d at 134, the Court does not find that "it would be a manifest injustice to let the guilty verdict stand," *Sanchez*, 969 F.2d at 1414 (citation omitted). Rather, the Court is "satisfied that competent, satisfactory, and sufficient evidence in the record supports the jury verdict." *Ferguson*, 246 F.3d at 134.

## IV. CONCLUSION

For the reasons set forth above, Scott's motions are DENIED. The Clerk of Court is respectfully directed to terminate the motions, Docs. 218 and 410.

69a

*Appendix B*

It is SO ORDERED.

Dated:   September 14, 2023
         New York, New York

/s/ Edgardo Ramos
EDGARDO RAMOS, U.S.D.J.

70a

## APPENDIX C — DENIAL OF REHEARING OF THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT, FILED APRIL 21, 2025

### UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Docket Nos: 23-7199 (Lead)
24-368 (Con)

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 21st day of April, two thousand twenty-five.

UNITED STATES OF AMERICA,

*Appellee,*

v.

KARL SEBASTIAN GREENWOOD,
MARK S. SCOTT,

*Defendants-Appellants,*

RUJA IGNATOVA, AKA CRYPTOQUEEN,
KONSTANTIN IGNATOV, AKA SEALED
DEFENDANT 1, DAVID R. PIKE, FRANK
SCHNEIDER, IRINA DILKINSKA,

*Defendants.*

71a

*Appendix C*

**ORDER**

Appellant, Mark S. Scott, filed a petition for panel rehearing, or, in the alternative, for rehearing *en banc*. The panel that determined the appeal has considered the request for panel rehearing, and the active members of the Court have considered the request for rehearing *en banc*.

IT IS HEREBY ORDERED that the petition is denied.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

/s/ Catherine O'Hagan Wolfe

72a

## APPENDIX D — DENIAL OF REHEARING OF THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT, FILED APRIL 21, 2025

### UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Docket Nos: 23-7199 (Lead)
24-368 (Con)

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 21st day of April, two thousand twenty-five.

UNITED STATES OF AMERICA,

*Appellee,*

v.

KARL SEBASTIAN GREENWOOD,
MARK S. SCOTT,

*Defendants-Appellants,*

RUJA IGNATOVA, AKA CRYPTOQUEEN, KONSTANTIN IGNATOV, AKA SEALED DEFENDANT 1, DAVID R. PIKE, FRANK SCHNEIDER, IRINA DILKINSKA,

*Defendants.*

73a

*Appendix D*

## ORDER

Appellant, Karl Sebastian Greenwood, filed a petition for panel rehearing, or, in the alternative, for rehearing *en banc.* The panel that determined the appeal has considered the request for panel rehearing, and the active members of the Court have considered the request for rehearing *en banc.*

IT IS HEREBY ORDERED that the petition is denied.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

/s/ Catherine O'Hagan Wolfe

74a

## APPENDIX E — RELEVANT STATUTORY PROVISIONS

### 18 U.S.C.A. § 1956

### § 1956. Laundering of monetary instruments

**(a)(1)**    Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--

\* \* \*

**(B)**    knowing that the transaction is designed in whole or in part--

　**(i)**    to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

\* \* \*

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both. For purposes of this paragraph, a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful

75a

*Appendix E*

activity, and all of which are part of a single plan or arrangement.

**(2)**   Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States--

\* \* \*

**(B)**   knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part--

**(i)**   to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

\* \* \*

shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, whichever is greater, or imprisonment for not more than twenty years, or both. For the purpose of the offense described in subparagraph (B), the defendant's knowledge may be established by proof that a law enforcement officer represented the matter specified in subparagraph (B) as

76a

true, and the defendant's subsequent statements or actions indicate that the defendant believed such representations to be true.

\* \* \*

**(c)**    As used in this section--

**(1)**    the term "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law, regardless of whether or not such activity is specified in paragraph (7);

\* \* \* \*